Donna Rowell v. The Kroger Co., et al.
Donna Rowell
Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 1 of 124
March 10, 2016

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA


DONNA ROWELL,

       Plaintiff,

   vs.

THE KROGER CO.,
An Ohio for Profit Corporation,

       Defendant.
_____

CASE NO.:
1:15-cv-00856-RWS


DEPOSITION OF
DONNA ROWELL



March 10, 2016
11:03 a.m.



166 North Finley Street
Athens, Georgia



Alison M. Wyman, CCR-2529, RPR


Elizabeth Gallo
COURT REPORTING, LLC

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                        March 10, 2016

Page 2

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiff:      JAMES M. LOREN
                             Attorney at Law
 3                           Loren Law Group
                             100 South Pine Island Road
 4                           Suite 132
                             Plantation, Florida  33324
 5                           (678) 224-5702
                             (954) 585-4886 (Fax)
 6                           jloren@lorenlaw.com

 7   For the Defendant:      CANDIS R. JONES
                             Attorney at Law
 8                           Gray, Rust, St. Amand, Moffett &
                             Brieske, LLP
 9                           950 East Paces Ferry Road
                             1700 Atlanta Plaza
10                           Atlanta, Georgia  30326
                             (404) 870-7373
11                           (404) 870-7374 (Fax)
                             cjones@grsmb.com
12

13                           -  -  -  -  -

14

15

16

17

18

19

20

21

22

23

24

25
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

```
 1                          INDEX
    DONNA ROWELL                                        PAGE
 2
    CROSS-EXAMINATION
 3       By Ms. Jones                                      4

 4  DIRECT EXAMINATION
         By Mr. Loren                                    113
 5

 6                       -  -  -  -  -
 7

 8
                    INDEX TO EXHIBITS
 9
    DEFENDANT'S          DESCRIPTION               PAGE
10
    Exhibit 1      Amended notice to take
11                 deposition and notice to
                   produce to Plaintiff Donna
12                 Rowell                            5

13  Exhibit 2      Hand-drawn diagram               42

14

15  (Original Exhibits 1 and 2 have been attached to the
    original transcript.)
16

17                       -  -  -  -  -
18

19

20

21

22

23

24

25
```

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 4 of 124
Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 4

1          MS. JONES:  This will be the deposition of

2     Donna Rowell taken in the matter of Donna Rowell

3     vs. The Kroger Company, currently pending in the

4     United States District Court for the Northern

5     District of Georgia, Atlanta Division, Civil File

6     Action No.:  1:15-CV-0856.  This deposition is

7     being taken pursuant to notice and the Federal

8     Rules of Civil Procedure for discovery, trial, and

9     all other purposes allowed.

10          You can swear in the witness.

11                    DONNA ROWELL,

12    being first duly sworn, was deposed and testified as

13    follows:

14                 CROSS-EXAMINATION

15    BY MS. JONES:

16        Q.   Good morning, Ms. Rowell.  My name is

17    Candice Jones.  I am the attorney for Kroger in the

18    matter Donna Rowell vs. Kroger.  Today we're here to

19    talk about your incident that occurred back in 2014 in

20    our College Station store and just find out a little

21    bit about your history, the incident, and your

22    treatment following the incident.  Okay?

23        A.   Okay.

24          MS. JONES:  And before we start, James, with

25     regard to objections, I ask that all objections

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 5

```
 1      except to the form of the question or

 2      responsiveness of the answer be reserved to the

 3      first time of use of deposition.  Is that fine?

 4           MR. LOREN:  That's fine.

 5      Q.   (By Ms. Jones)  Okay.  Ms. Rowell, have you

 6  ever given a deposition before?

 7      A.   I have not.

 8      Q.   Okay.  Well, you're doing great.  It's just

 9  a question and answer type of conversation between you

10  and I.  But the only thing is we have a court reporter

11  here that will be taking down everything we say.

12  Because of that, I just ask that you give verbal

13  responses and allow me to answer -- complete my

14  question before you answer.  And I will allow you to

15  answer before I have a follow-up question.  Okay?

16      A.   Yes.

17      Q.   And at any point if you need to take a

18  break, you're able to do so.  And if you want me to

19  rephrase my question or ask it in a way so that you

20  can understand what I'm asking, please ask me and I'll

21  rephrase it.  Otherwise, if you answer I will assume

22  that you understood the question as posed.  Okay?

23      A.   Okay.

24           MS. JONES:  I want to mark as Defendant's

25      Exhibit 1 the notice of deposition and notice to
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 6

1      produce that we sent to plaintiff's counsel in

2      this case.

3          (Defendant's Exhibit 1 was marked for

4      identification.)

5      **Q.   (By Ms. Jones)  And Ms. Rowell, we sent just**

6  **a formal document which requests that you be here for**

7  **today's deposition, and we're in Athens, Georgia.  It**

8  **requested that you bring either the pictures or actual**

9  **shoes that you were wearing at the time of the**

10  **incident.  Do you have those with you today?**

11      A.   I do not.  I don't remember what shoes they

12  were.

13      **Q.   Okay.**

14          MR. LOREN:  Just for the record, and just to

15      sort of clarify, your amended noticed is dated

16      March 8th, three days ago.  And just to avoid

17      unnecessary back and forth, all the documents in

18      our control, custody or control, have been

19      produced.  So we didn't bring any documents with

20      us because you have it all.

21          MS. JONES:  Okay.  And that's fine.

22          MR. LOREN:  Make it real simple.

23          MS. JONES:  But for the record, it was also

24      the shoes and everything like that requested.  So

25      you're saying that you don't have any of the items

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 7

1    that were enumerated on this list?

2         MR. LOREN:  Right.  Well, you asked for

3    medical bills and records and stuff, which have

4    been produced, of course, in discovery.

5         MS. JONES:  Okay.

6         MR. LOREN:  Shoes weren't produced because

7    she doesn't remember what she was wearing.

8         MS. JONES:  Okay.

9         MR. LOREN:  So therefore she can't produce

10   something that she --

11        MS. JONES:  And we'll go over the incident

12   report, because I think it says "flip-flops."  So

13   to the extent that she has those --

14        MR. LOREN:  Just so you know, I actually

15   have possession of the accident -- incident

16   report.

17        MS. JONES:  The original copy or just a copy

18   that we produced in discovery?

19        MR. LOREN:  I don't know where it came from.

20   But I -- looking in my file, I have a copy of it.

21        MS. JONES:  Oh.  Well, then that would have

22   been something we produced in discovery.

23        MR. LOREN:  Okay.

24        MS. JONES:  Okay.

25        MR. LOREN:  'Cause I saw an objection to it,

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

                                                                    Page 8
1       but then I have it.  So I'm not sure what came

2       first.

3             MS. JONES:  It would be -- I would have to

4       look at it.  We can talk about it off line.

5       Q.   (By Ms. Jones)  Okay.  For the record,

6    Ms. Rowell, can you state your full name.

7       A.   Donna Jane Rowell.

8       Q.   And have you been known by any other name?

9       A.   No.

10      Q.   Okay.  Meaning, like, a married name or a

11   maiden name.

12      A.   No.

13      Q.   That kind of thing.

14      A.   No.

15      Q.   And your date of birth, please.

16      A.   12/14/1967.

17      Q.   And where were you born?

18      A.   New Bedford, Massachusetts.  Can I clarify

19   something?

20      Q.   Sure.

21      A.   I was adopted.

22      Q.   Okay.

23      A.   So does that mean my original name that I

24   was born with?

25      Q.   If you know it, that's fine.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 9

```
 1      A.    'Cause, I mean...

 2      Q.    But it --

 3      A.    I don't want to lie.

 4            MR. LOREN:  I think it's legal name.

 5      Q.    (By Ms. Jones)  Yes.

 6      A.    Okay.

 7      Q.    If you've always been known --

 8      A.    Okay.

 9      Q.    -- as Donna Jane Rowell --

10      A.    Okay.

11      Q.    -- that's fine.

12      A.    Okay.

13      Q.    Since you're 18, let's say.

14      A.    Oh, okay.

15      Q.    You've always been known as Donna Jane

16  Rowell; is that correct?

17      A.    Yes.

18      Q.    Okay.  When did you come to Atlanta?  Or

19  excuse me, Athens.

20      A.    February 22nd of 1996.

21      Q.    And what brought you to Athens?

22      A.    My boyfriend and I moved because of his job.

23      Q.    Okay.  And did you move directly from New

24  Bedford to Athens?

25      A.    No, from Burlington, Vermont.
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                        March 10, 2016

Page 10

 1        Q.   And how long were you living in Burlington,
 2   Vermont?
 3        A.   I don't know exactly.  I would say
 4   approximately eight years.
 5        Q.   Okay.  And do you recall the time frame that
 6   you were living in Vermont?  And you gave me the
 7   duration.  But, like, from X to Y or X to --
 8        A.   Oh, yeah.  I was living from one years old
 9   till I was 28.
10        Q.   And that was in Burlington, Virginia?
11   Vermont.
12        A.   No.
13        Q.   I'm getting confused now.
14        A.   I was adopted by a family in Albany,
15   Vermont.
16        Q.   Okay.
17        A.   I went to college in Johnson.
18        Q.   Okay.
19        A.   Vermont.  Then moved to Burlington, Vermont,
20   in '86.
21        Q.   Okay.  And what --
22        A.   Then from there came to Athens in '96.
23        Q.   Okay.  Perfect.  What college did you go to?
24        A.   Johnson State College.
25        Q.   Okay.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

 1       A.    Then Champlain College in Burlington.

 2       Q.    Do you have a degree from either Johnson

 3   State College or Champlain College?

 4       A.    No, I do not.

 5       Q.    What was the highest level of college you

 6   completed?

 7       A.    Just two years.

 8       Q.    Do you have any kind of certifications or

 9   licenses that you hold currently or prior to today?

10       A.    I had a CNA.

11       Q.    And where did you obtain your CNA?

12       A.    In Vermont.

13       Q.    Okay.  With your CNA, were you ever employed

14   as a CNA down in Athens or...

15       A.    Yes.

16       Q.    Would you -- where were you employed in

17   Athens or where did you work as far as a CNA?

18       A.    I worked in home health care.

19       Q.    For a particular company?

20       A.    I did, but I don't remember what the

21   company's name was.

22       Q.    Okay.  And how long ago was that?

23       A.    Fifteen years ago.

24       Q.    Any other employment held by you since

25   you've lived in Athens other than working for the home

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

1   health care?

2        A.   (Witness nods head affirmatively.)

3        Q.   Okay.

4        A.   Yes.  I worked through the State.

5        Q.   And what did you do for the State?

6        A.   I worked in different areas with social

7   services.

8        Q.   Okay.  Why don't you, if you can, go through

9   the different areas that you worked with social

10   services.

11        A.   I worked for Advantage Behavioral Health

12   Systems.  The health department.  I believe that's it

13   because I just worked different jobs within Advantage

14   Behavioral Health.

15        Q.   Okay.  And what was the last or most recent

16   position held by you either with the State of Georgia

17   or with another personal company?

18        A.   The home health care.

19        Q.   Okay.  What is your current address?

20        A.   144 Scandia Circle, Apartment 5, Athens,

21   Georgia, 30605.

22        Q.   And how long have you lived at the Scandia

23   Circle address?

24        A.   Since July 1st of 2015.

25        Q.   And where were you living before Scandia

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

 1  Circle?

 2       A.    113 Georgetown Circle, Apartment A-13, in

 3  Athens, Georgia, 30605.

 4       Q.    And how long did you live at the Georgetown

 5  address?

 6       A.    Two years.

 7       Q.    And prior to Georgetown?

 8       A.    I lived in 124 Scandia Circle, Athens,

 9  Georgia, 30605.

10       Q.    Was there an apartment number in this 124

11  Scandia Circle?

12       A.    No.

13       Q.    Okay.  At the time of the incident where

14  were you living?  The Kroger incident.

15       A.    At 113 Georgetown Circle.

16       Q.    Do you live with anyone at the 113

17  Georgetown Circle address?  At the time of the

18  incident did you live with anyone?

19       A.    My daughter.

20       Q.    Okay.  How old is your daughter?

21       A.    She's now 15 years old.

22       Q.    And what's her name?

23       A.    Genesis Alysse Crawley.

24       Q.    I think earlier you mentioned moving down

25  here with a boyfriend.  Does your boyfriend or does

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

March 10, 2016

```
 1   that gentleman still live with you or --

 2       A.   No.

 3       Q.   -- associate with you in any way?

 4       A.   I mean, he's -- he's the father of my

 5   children.

 6       Q.   Okay.  Meaning would he know anything about

 7   the subject Kroger incident, is what --

 8       A.   Yes.

 9       Q.   -- I'm getting at.  Okay.  And what's his

10   name?

11       A.   R.D., initials R, period, D, period,

12   Crawley, Jr.

13       Q.   And where does R.D. live?

14       A.   At 220 Twin Creek Shores, Athens, Georgia,

15   30605.

16       Q.   At any point from the time of the subject

17   incident to today, has R.D. lived with you at either

18   the 113 Georgetown address or your 144 Scandia Circle

19   address?

20       A.   No.

21       Q.   Have you ever been married?

22       A.   No.  We -- we were -- R.D. and I were

23   considered common law because we were living together

24   before 1996.

25       Q.   Oh, okay.  Are you still technically, I
```

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

March 10, 2016

Page 15

1   guess, considered common law or...

2         A.    No.

3         Q.    Okay.  Other than Genesis, do you have any

4   other kids?

5         A.    Yes.

6         Q.    Okay.  And if you can, for the record, just

7   state the names of your kids and their ages.  Okay?

8         A.    Okay.  Isaiah Christian Rowell.  He's 25.

9   And Branden Elijah Crawley.  And he's 17.  And then

10  Genesis.

11        Q.    Okay.  Does Isaiah or Branden know anything

12  regarding the subject incident or your injuries and

13  treatment related to the subject incident?

14        A.    Yes.

15        Q.    Tell me -- and we're going to go back.  Tell

16  me what R.D. knows about the subject Kroger incident.

17        A.    R.D. is the first person that I called when

18  it happened.

19        Q.    And what did you tell R.D.?

20        A.    I told him that I had just fallen in the

21  store and that my arm was hurting really bad and that

22  I was scared and I didn't know what to do.  And he

23  told me to go in and tell them what had happened and

24  make a report.

25        Q.    Okay.  Did R.D. come to the store?



Donna Rowell v. The Kroger Co., et al.
Donna Rowell

March 10, 2016

```
 1      A.   No.

 2      Q.   Had he been to that Kroger store before,

 3 R.D.?

 4      A.   Yes.

 5      Q.   Is that Kroger store located -- and we're

 6 talking about the College Station store.

 7      A.   Yes.

 8      Q.   But is that location close to -- or was it

 9 close to the Georgetown address where you lived --

10      A.   Yes.

11      Q.   -- at the time?  Is it or was it close to

12 the Twin Creek Shores address where R.D. resided?

13      A.   Yes.

14      Q.   And other than telling you to make a report,

15 did R.D. give you any other advice or say anything

16 else to you about the incident or what you should do?

17      A.   I mean, he told me to go and get medical

18 care if I needed it.

19      Q.   Okay.  Were you still in the store at the

20 time you called R.D.?

21      A.   No.

22      Q.   Were you in the parking lot --

23      A.   Yes.

24      Q.   -- at the time you called R.D.?  And he told

25 you to go back in and make a statement?
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 17

1        A.   Yes.

2        Q.   Okay.  Is R.D. a medical provider or have

3    any kind of medical background?

4        A.   No.

5        Q.   Okay.  I know some of the questions may seem

6    kind of intrusive or weird, but it's just -- I have to

7    ask, I apologize.  I'm not trying to offend you in any

8    way.

9             What does Isaiah know, if anything, about

10   the subject incident?

11       A.   I mean, just what I've told him.  I mean,

12   after the fact, that I had fallen and then, you know,

13   of course, my treatment after the fact.

14       Q.   Did Isaiah ever present to any medical

15   doctor or treatment with you relating to your injuries

16   sustained in the Kroger incident?

17       A.   I don't understand the question.

18       Q.   I mean, did he ever go with you to any of

19   your doctors' appointments or drive you there or

20   anything like that?

21       A.   Not that I recall.

22       Q.   Same thing for Branden.  Did Branden ever go

23   with you to any of your doctors' appointments, any

24   kind of treatment?

25       A.   Not that I recall.



Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 18 of 124

March 10, 2016

Page 18

1      Q.   Okay.  Mrs. Rowell, we're going to kind of

2  work backwards.  Have you ever filed a personal injury

3  claim prior to your Kroger claim made in 2014?  And

4  "personal injury," just to clarify, means any kind of

5  slip and fall or injury sustained in a business or

6  restaurant, a store, anything like that.

7      A.   Uh-huh.  I was working in Vermont at a car

8  dealership in 1995 or '96.  And I fell on my buttocks

9  and they gave me workmen's comp for approximately a

10 week while I was out of work.

11     Q.   Okay.  Did you go receive any kind of

12 treatment as it relates to that incident?

13     A.   Yes.  They covered, like, the medical visits

14 that I had to go to.

15     Q.   Okay.  Do you know -- let's start with the

16 name of the employer that you were working -- you said

17 it was a car wash.  But do you know the name --

18     A.   No.

19     Q.   -- of the car wash?

20     A.   A car dealership.

21     Q.   A car dealership, I'm sorry.  Do you

22 remember the name?

23     A.   Heritage Ford.

24     Q.   And were you just a sales rep or something

25 like that?  A salesman, a saleswoman?

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                             March 10, 2016

 1      A.   Yes, I was a saleswoman.

 2      Q.   And you fell on your butt.  Do you know what

 3 caused you to fall?

 4      A.   I was -- I was climbing up into a Ford F-350

 5 and there was ice on the step and I slipped and fell

 6 onto the pavement.  Onto my tailbone.

 7      Q.   Did you -- you mentioned that, I guess,

 8 Heritage Ford paid for your treatment.  Do you recall

 9 what you were diagnosed with or what kind of injuries

10 you sustained?

11      A.   I had a bruised tailbone.

12      Q.   And what kind of treatment can you do for a

13 bruised tailbone?  Is it something that just kind of

14 heals on its own?

15      A.   I mean, they had me just sitting on, like,

16 a...

17      Q.   Like a doughnut?

18      A.   Doughnut, yes.  Yes.

19      Q.   Okay.

20      A.   Yeah.  And icing it.  That's pretty much it.

21      Q.   Okay.

22           MR. LOREN:  Krispy Kreme.

23           MS. JONES:  Yeah, I'm allowed to sit on

24      Krispy Kreme.

25           THE WITNESS:  That's pretty much it.

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 20 of 124

Page 20

```
 1       Q.    (By Ms. Jones)  I'm thinking a tailbone -- I
 2  don't know how much they can do.
 3       A.    Yeah.
 4       Q.    And I'm assuming pain meds?
 5       A.    Yeah, I believe so.  Yeah.
 6       Q.    And other than your incident with Heritage
 7  Ford, any other kind of personal injury or workers'
 8  compensation injuries you can think of?
 9       A.    No.
10       Q.    Okay.
11       A.    Huh-uh.
12       Q.    Ever file bankruptcy?
13       A.    No.
14       Q.    Applied for disability?
15       A.    I'm on disability.
16       Q.    Okay.  How long have you been on disability?
17       A.    Since 2002, I believe.
18       Q.    And what are the circumstances surrounding
19  you being on disability?
20       A.    I struggle with posttraumatic stress
21  disorder and severe depression.
22       Q.    And if you can, tell me -- have you ever
23  served in the armed forces --
24       A.    No.
25       Q.    -- or anything like that?  Okay.  How or why
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

 1   were you diagnosed with PTSD and/or depression?

 2        A.   I was raped by my cousin and then I was in

 3   an abusive relationship with my ex.

 4        Q.   Okay.

 5        A.   My children's father.

 6        Q.   Okay.  And no physical -- not saying, you

 7   know, physical, like inability to walk or anything

 8   like that.  Just other circumstances --

 9        A.   Right.

10        Q.   -- that led to your being on disability?

11        A.   Right.

12        Q.   Okay.  Do you smoke cigarettes?

13        A.   Yes.

14        Q.   About how many cigarettes do you smoke a

15   day?

16        A.   Less than half a pack.

17        Q.   Has it always been less than half a pack?

18        A.   Yes.

19        Q.   If in your medical records I saw where it

20   said a pack a day, would that be wrong?

21        A.   Yes, that's wrong.

22        Q.   How long have you smoked cigarettes?

23        A.   Thirty years.

24        Q.   Other than the birth of your kids, have you

25   ever been hospitalized for more than a day for any

Donna Rowell v. The Kroger Co.; et al.
Donna Rowell

March 10, 2016

Page 22

```
 1  reason or circumstance?
 2      A.   Yes.  For a hysterectomy.
 3      Q.   Okay.  And let me clarify that.  Anything
 4  before the Kroger incident in April 2014.  So other
 5  than the hysterectomy and the birth of your kids, any
 6  other hospitalizations?
 7      A.   Not that I can think of, no.
 8      Q.   Okay.  Have you ever been diagnosed with any
 9  kind of conditions like hypertension or diabetes, any
10  kind of those type of conditions?
11      A.   No.
12      Q.   Are you currently taking any medications for
13  pain or any other kind of condition?
14      A.   Yes.
15      Q.   Okay.  If you can, just tell me what you're
16  taking and what it's for, okay?
17      A.   Okay.
18      Q.   Okay.
19      A.   I take Effexor XR for anti -- it's an
20  antidepressant.  I take estradiol.  That's a hormone
21  replacement.  I take morphine for pain.  I take
22  Robaxin for a muscle relaxant.  I take Lyrica for
23  nerve pain.  And I take topiramate for migraine
24  headaches.  And trazodone to help me sleep.  And
25  they -- they just gave me Botox shots to help with the
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

```
 1   migraines.

 2        Q.   Is that it?

 3        A.   Yeah.

 4        Q.   Okay.  Have you ingested all of these

 5   medications or some of these medications today?

 6        A.   Yes.

 7        Q.   Will it prevent you from accurately

 8   testifying at all as far as the incident or anything

 9   else related to this case?

10        A.   No.

11        Q.   Okay.  Would you have taken these same

12   medications on the day of the subject incident?

13        A.   I would have taken the antidepressant and

14   the hormone replacement.

15        Q.   Okay.  So that means the morphine, the

16   muscle relaxer and the nerve pain and migraines and

17   the sleep medicine came after the Kroger incident?

18        A.   Oh, the sleep pain [sic] I was taking prior.

19        Q.   Okay.

20        A.   And I forgot the Percocet also.

21        Q.   Okay.  Would it be safe to say all of your

22   pain medicine came after the Kroger incident?

23        A.   Yes.

24        Q.   Has a doctor or medical professional said

25   that these medications were prescribed because of your
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

1    injuries related to the Kroger incident?

2         A.    Yes.

3         Q.    Okay.  I just want to make sure.

4         A.    Uh-huh.

5         Q.    Prior to April 30th, 2014, had you ever had

6    any injury to your right or left hand or wrist?

7         A.    Not that I recall.

8         Q.    Prior to April 30th, 2014, had you ever had

9    any problems or injury to your neck or collarbone?

10        A.    No.  Not that I remember.

11        Q.    Prior to April 30th, 2014, had you ever had

12   any injury of your right rotator cuff?

13        A.    Not that I remember, no.

14        Q.    Okay.  How about your right elbow?

15        A.    Yes.

16        Q.    Okay.  Tell me about that.

17        A.    I had fallen years prior to the fall at

18   Kroger.  And I had gone to the doctor and they never

19   actually told me if it was fractured or if it was

20   broken or anything like that.  They never did anything

21   about it.  I kept asking if it was broken or if they

22   were going to put it in a cast, and they never did

23   anything.

24        Q.    Tell me about the fall, the circumstances

25   surrounding the fall, that resulted in you going to

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                                    March 10, 2016

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 25 of 124

Page 25

1    the doctor.  Tell me about that.

2        A.   When I injured my elbow that time?

3        Q.   **Yes, ma'am.**

4        A.   I was reaching to actually -- I had stepped

5    up on a stool to hit a spider that was, like, above

6    the door frame, with a shoe, and I fell.

7        Q.   **So you were at home?**

8        A.   Yes.  Yes.

9        Q.   **And fell off --**

10       A.   And my arm bruised up.

11       Q.   **And referring to your right arm, right?**

12       A.   My right elbow, yes.

13       Q.   **How high was the stool that you fell off of,**

14   **if you can recall?**

15       A.   Maybe, like, 8 inches tall.

16       Q.   **When you presented to the doctor you said**

17   **they pretty much didn't do anything or --**

18       A.   No.

19       Q.   **-- didn't do --**

20       A.   When I first went in they said it was too

21   swollen to x-ray, to be able to see anything, and told

22   me to come back in -- I forget if it was a week or

23   two.

24       Q.   **Where did you go get treated or where did**

25   **you initially present?**

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 26 of 124

March 10, 2016

Page 26

```
 1      A.   It was an orthopedic doctor on Hawthorne and
 2 they're no longer there.   In Athens.
 3      Q.   Hawthorne?
 4      A.   Hawthorne Avenue, yes.
 5      Q.   Okay.  Other than that initial treatment to
 6 the orthopedic doctor, any other kind of follow-up
 7 treatment you had with regards to your right elbow?
 8      A.   No.
 9      Q.   Okay.  Do you recall when this fall
10 occurred?  You said years before.  But do you know,
11 like, the approximate year?
12      A.   My daughter was around two years old, so it
13 had to be about 13 years prior.
14      Q.   Okay.
15      A.   Yeah.
16      Q.   Other than the fall from the step stool, any
17 other kind of falls or injuries -- type of falls or
18 similar type of events before your Kroger incident?
19      A.   Not that I remember, no.
20      Q.   Had you ever had an issue where your leg
21 would give out on you that resulted in a fall or some
22 kind of instability?
23      A.   I mean, occasionally my leg would give out
24 on me.  Not really give out on me.  I had a problem
25 with leg pain where it would, like, pop.  My knee
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell
Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 27 of 124
March 10, 2016

Page 27

1  would pop.

2      Q.   Did it ever -- did the left leg pain ever

3  prohibit you from walking or impact your ability to

4  walk or stand?

5      A.   No, not where I would fall.  No.

6      Q.   Okay.  Had you ever had a time where you

7  fell down stairs in your home or fell down -- any

8  other kind of ground level falls in your home?

9      A.   I fell down some stairs at my brother's

10 house one time, but I never had stairs at my house.

11     Q.   Tell me about the time when you fell at your

12 brother's house.

13     A.   I mean, it wasn't that big of a fall.  It

14 was just I fell down a few stairs.

15     Q.   Do you recall the number of stairs?

16     A.   I don't.

17     Q.   Do you know when this fall occurred?

18     A.   I don't.

19     Q.   Do you know what portions of your body, if

20 any, sustained any kind of injury as a result of the

21 fall?

22          MR. LOREN:  Sorry.  Can you repeat the last

23     question, please?

24     Q.   (By Ms. Jones)  Do you know what portions of

25 your body sustained injury as a result of the fall?



Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 28

 1   And I'm talking about the fall at your brother's

 2   house.

 3        A.   No, I don't.

 4        Q.   Do you recall ever going to a doctor or

 5   anyone regarding the fall at your brother's house?

 6        A.   I don't.

 7        Q.   Have you ever been arrested for a crime?

 8        A.   Yes.

 9        Q.   Okay.  Tell me about that.

10        A.   I -- I was drinking with some friends and

11   they convinced me to try to steal some meat at

12   Walmart.  And I didn't know how to do it very well and

13   got caught.

14        Q.   Okay.  Was it here in Athens?

15        A.   Yes.

16        Q.   And what Walmart were you at?  Which one

17   here in Athens?

18        A.   The Eastside.

19        Q.   Okay.  And you said you got caught.  Were

20   you caught by an employee at Walmart or did, like,

21   cops or someone come?

22        A.   No.  I was doing it right in front of a

23   manager.

24        Q.   Okay.

25        A.   And they -- I mean, it was awful because

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 29

1    my -- my friend worked there and it was her -- her

2    husband had just died.  And it was just an awful

3    situation.  But they wanted to make an example of me,

4    so...

5         Q.   Okay.

6         A.   Yeah.

7         Q.   Were you arrested by -- is it the

8    Athens-Clarke County police?

9         A.   Yeah, they called the Athens-Clarke County

10   police.  It was $32 of meat and they...

11        Q.   And that's in your bag or something or...

12        A.   I had put it in the cart.  I hadn't even got

13   past the counter.

14        Q.   Okay.  So you were just walking out the door

15   with the cart?

16        A.   No, I hadn't even got past the counter.

17        Q.   Oh, okay.

18        A.   I was, like, still at the counter.  I was

19   putting one -- one meat --

20        Q.   Oh, and then take --

21        A.   -- across the scanner and taking the other

22   piece of meat and putting it in the cart.  And he was

23   watching me do it.

24        Q.   Okay.

25        A.   And asked me if I paid for everything in the

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 30

```
 1   cart.  And I said, no.
 2        Q.   Oh, okay.
 3        A.   Yeah.
 4        Q.   Was the manager on the floor or do you know
 5   if he was in his office?
 6        A.   Yeah, he was right behind me.
 7        Q.   Okay.  So he might have been watching you
 8   the whole time you were in the store?
 9        A.   He was watching me the whole time.  Like,
10   you know how there's, like, one self-checkout and then
11   right directly behind it there's another one?  Yeah,
12   he was right there.
13        Q.   Okay.
14        A.   Watching me whole time.
15        Q.   How long did you have to stay in jail or
16   what happened after you were arrested?
17        A.   I went to jail for a few hours and then I
18   had asked -- I really don't remember.  But I know
19   that -- I don't recall.  I don't recall.  I know I
20   spent six days in jail and they brought me back in
21   front of the judge.  And she asked me if I had learned
22   my lesson and told me that it had been expunged.  So I
23   just assumed it was -- I didn't think it was anything
24   major.  And I never have drunk again since then, so...
25        Q.   I bet.
```



Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 31 of 124

March 10, 2016

Page 31

```
 1              MR. LOREN:  Just for the record, we did
 2       supplement the response.
 3              MS. JONES:  Yeah, I just saw it today.
 4              THE WITNESS:  Yeah.
 5              MS. JONES:  I just saw that.  So thank you.
 6              THE WITNESS:  Yeah.
 7         Q.   (By Ms. Jones)  I don't know if we got the
 8   year.  When did this occur?  What year did it occur?
 9         A.   My daughter was nine, I believe.  So seven
10   years ago, I believe.  No.
11         Q.   She's 15, right?  I'm not good at math.
12         A.   I'm not good at math either.  It's, like,
13   2010, I think.
14         Q.   Okay.
15         A.   Something like that.  Around that time.  It
16   may have been earlier than that.
17         Q.   Was it more or less than ten years ago?
18         A.   Yeah, yeah, it was less than ten years ago.
19         Q.   Okay.
20         A.   Yeah, it was about six years ago.  Yeah.
21         Q.   Okay.  Do you recall ever falling at your --
22   and I think we might have discussed this.  So if we
23   did, I apologize.  But do you remember falling at your
24   home, or a home, in August of 2012 and sustaining an
25   injury to your right elbow or shoulder?  Is that the
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

```
 1   one at your brother's house?

 2        A.   In 2012?

 3        Q.   Yes, ma'am.

 4        A.   In August?

 5        Q.   August 18th of 2012.  Do you recall -- let

 6   me -- how about I go back.  Have you ever treated at

 7   Athens Orthopedic Clinic?

 8        A.   Yes.  I've been there.

 9        Q.   Do you know a Dr. Michael Shuler?

10        A.   I'm not sure.

11        Q.   Okay.  Ever had any problems about your

12   right knee that caused you to be unable to walk or

13   stand for periods of time?

14        A.   Yeah, I get injections in my right knee.

15   It's not -- it's not with walking or standing.

16   It's -- it's just that I have pain with the way the

17   kneecap rolls over my knee.  It's -- it goes the wrong

18   way.  It's pulled the wrong way.  So they put

19   injections in there so that it's not painful.

20        Q.   Does it prevent you from walking at all?

21        A.   No.

22        Q.   Okay.  Well, I just want to know because you

23   said it pulls over your kneecap.  So I didn't know if

24   it had --

25        A.   The kneecap pulls -- like, it's supposed to
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 33

1  go straight across, but it pulls to the side, so it

2  causes pain.  So they inject cortisone so that it

3  doesn't cause so much pain.

4      Q.   And did you have this problem prior to the

5  Kroger incident?

6      A.   Yes.

7      Q.   Did any doctor prescribe any kind of cane or

8  walking aid as a result of it?

9      A.   No.

10     Q.   Has any doctor or medical professional

11  diagnosed you with, like, being pigeon-toed or

12  slue-foot as a result of -- or any kind of other --

13     A.   No.

14     Q.   -- gait infractions?  Okay.

15     A.   No, not that I know of.

16     Q.   Okay.  So you recall presenting at Kroger on

17  April 30th, 2014?

18     A.   Correct.

19     Q.   And it was the College Station Kroger,

20  correct?

21     A.   Yes.

22     Q.   What were you wearing on that day, if you

23  can recall?

24     A.   I don't recall.  I -- I don't recall.

25     Q.   Do you recall the shoes that you were

Elizabeth Gallo
COURT REPORTING, LLC

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                          March 10, 2016

 1   wearing at the time?

 2        A.   No.  I mean, I can say I've been told that I

 3   was wearing flip-flops and I...

 4             MR. LOREN:  Don't discuss our conversations.

 5             THE WITNESS:  Okay.

 6        Q.   (By Ms. Jones)  Okay.  Other than a

 7   conversation with your lawyer -- and of course, I

 8   don't want you to -- but any other knowledge about

 9   what you could have been wearing that day?

10        A.   I remember wearing sweatpants, these black

11   sweatpants, that was kind of nylon.  'Cause I remember

12   them being soaking wet.  The leg being soaking wet.

13        Q.   And why were your pants soaking wet?

14        A.   Because I fell into the water when I

15   slipped.

16        Q.   Was anyone with you on the day that you

17   presented to Kroger?  Like, did you have anyone else

18   with you when you came in that day?

19        A.   No, I did not.

20        Q.   You remember wearing the black sweatpants,

21   but you don't remember the shoes, correct?

22        A.   Correct.

23        Q.   Other than what you've been told from other

24   people?

25        A.   Correct.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                      March 10, 2016

Page 35

1      Q.    Are you prescribed any kind of eyewear or
2  corrective lenses?
3      A.    I wear contacts.
4      Q.    Would you have been wearing your contacts on
5  the day of the subject incident?
6      A.    Yes.
7      Q.    Do you recall if you had, like, a purse or a
8  satchel or any kind of bag with you on the day of the
9  incident?
10     A.    I don't remember.
11     Q.    And I think we already discussed it, but --
12  we talked about what medications you would have
13  ingested that day, which would have been the hormone
14  replacement and the antidepressant, correct?
15     A.    Correct.
16     Q.    No other medications?
17     A.    No.
18     Q.    Any alcohol?
19     A.    No.
20     Q.    Do you know if you had a shopping cart with
21  you at any point while you were in the store?
22     A.    No, I didn't.
23     Q.    Do you recall the items that you were
24  purchasing that day?  I know it's so long ago.
25     A.    I know what I was going in there for.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 36 of 124

March 10, 2016

Page 36

1      Q.   Okay.  Tell me.

2      A.   I went in there to get -- I went in there to

3  get these rolls that I always purchase and that they

4  hadn't had for a few days.  And I went down Aisle 18

5  to look for the rolls and they didn't have them in

6  yet.  And so then I went down around -- do you want me

7  to tell you the whole story?

8      Q.   Yeah, go ahead.

9      A.   So I went down towards the bottom of the

10  aisle and turned left, down past the sale freezer.

11  And there was a couple cones down at the bottom.  I

12  looked down around there to see if it was wet.  And

13  then I went to the right, around the -- by the eggs,

14  and followed down the right side of the aisle.  It's

15  just, like, tables, kind of like with doughnuts and

16  muffins and things on it.  So I went down the right

17  side by the juice and walked down until I saw where

18  the freezer had the ice cream.

19          But I was walking, like, making sure I was

20  looking directly in front of me 'cause I was looking

21  for -- you know, in case there was a spill or

22  something, or the wet floor, because of the signs.

23          And I went in between the tables and reached

24  for the ice cream.  And, you know, not thinking

25  anything would be up that far.  And when I reached for



Donna Rowell v. The Kroger Co., et al.
Donna Rowell
March 10, 2016

Page 37

1    the ice cream -- for the freezer door, I just
2    remember, like, slipping and just -- the next thing I
3    knew I was, like, wet and just feeling extreme pain.
4         Q.    Okay.  I'm going to probably have to go
5    back --
6         A.    Okay.
7         Q.    -- to ask you some follow-up questions.
8         A.    Okay.
9         Q.    Do you recall if it had been raining on the
10   day of the incident?
11        A.    I don't believe so.
12        Q.    And when I say the "day of the incident," I
13   mean April 30th, 2014, okay?
14        A.    Right, yeah.  Not that I remember.
15        Q.    Okay.  Do you recall whether the flooring
16   was a tile type of floor or concrete?
17        A.    It was tile.
18        Q.    Okay.  And I say that because some of the
19   Kroger stores have now changed over to, like, a
20   finished concrete look.  So I didn't know what the
21   condition was.  But you're saying it's tile or was
22   tile at the time?
23        A.    From what I remember it was tile.
24        Q.    Okay.  You mentioned rolls.  "Rolls" as in,
25   like, the bread, the yeast rolls?

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 38

```
 1      A.   Yes.
 2      Q.   Okay.  And that roll --
 3      A.   Frozen -- frozen yeast rolls, yes.
 4      Q.   You mentioned they had not been in the
 5 store.  Did someone call you to tell you that they
 6 were now stocked in the store or you were just
 7 stopping by?
 8      A.   No, I just stopped by.
 9      Q.   And you mentioned "Aisle 18."  Is that
10 typically where they are?  Is that a frozen food
11 aisle?
12      A.   Yes.
13      Q.   And in comparison to Aisle 18, the frozen
14 food aisle, where did you see a couple of cones?
15 Where were the cones?  Actually, if you can, we'll
16 draw a diagram just so I can get a picture.
17           MR. LOREN:  May I make a suggestion, just to
18      kind of help out?  I'm not a big fan of diagrams
19      for the simple reason that -- I've never, ever
20      actually had them useful in court because nobody
21      can draw properly.  How about a nice screenshot of
22      your own surveillance --
23           MS. JONES:  How about we have her draw?  I
24      want her to draw.
25           MR. LOREN:  Okay.
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                                    March 10, 2016

Page 39

1          MS. JONES:  And if it continues, then we can

2     use other aids.  But I would prefer her to draw.

3          MR. LOREN:  Yeah, I have an objection to it.

4          MS. JONES:  Okay.  Well, that's fine.

5          MR. LOREN:  Yeah, but we -- see, this is a

6     verbal deposition.  This --

7          MS. JONES:  No.

8          MR. LOREN:  It doesn't require her to sit

9     here and draw pictures.

10         MS. JONES:  Okay.  But if I want her to tell

11    me -- we can go -- actually, stay on the record.

12         MR. LOREN:  Okay.

13         MS. JONES:  If I want her to draw for me how

14    she recalls the location of the cones and the

15    aisle, she's -- I'm entitled to that.  And I can

16    attach that drawing to the deposition as an

17    exhibit.

18         MR. LOREN:  Okay.

19         MS. JONES:  If you have an objection to

20    that, we can go off the record, we can call the

21    court and ask them if it is permissible for a

22    witness to draw a diagram.  But I've never -- have

23    not had a witness been able to draw a diagram

24    because you want to use a document that you think

25    would be better suited for my deposition.



Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 40 of 124

March 10, 2016

Page 40

```
 1          MR. LOREN:  Well, let me ask you a silly
 2     question before we trouble the court with trivial
 3     matters.  Why would it not be more advantageous to
 4     take a photograph from your own surveillance video
 5     as a basis --
 6          MS. JONES:  Because I want Ms. Rowell to
 7     draw the diagram as she recalls it on the day of
 8     the incident.  Thank you.  And if you want, you
 9     can use whatever documents you want in the
10     depositions --
11          MR. LOREN:  Okay.
12          MS. JONES:  -- that you will take later on
13     today and tomorrow.
14          MR. LOREN:  Okay.  Well, we have an
15     objection to the form of the question and the
16     predicate and...
17          MS. JONES:  Okay.  Thank you.
18     Q.   (By Ms. Jones)  Ms. Rowell, if you can, draw
19     the aisle, the frozen food aisle, as you recall, and
20     then the location of the cones where you recall them
21     to be in comparison to where you eventually slipped.
22     Do you understand the question or the request?
23     A.   Could you say it one more time?
24     Q.   Okay.  You mentioned that you went down
25     Aisle 18, saw a couple of cones, and then eventually
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

1   went on the side or around some tables where the yeast

2   and bread items are, to open the ice cream freezer,

3   and then you eventually slipped and fell.

4        A.   Uh-huh.

5        Q.   Correct?

6        A.   Correct.

7        Q.   I would like for you, if you can, subject to

8   your attorney's objections, to draw for me the aisle

9   where the frozen food is.  And it doesn't have to be a

10   pretty drawing.  I just want to get an understanding

11   of the aisle location with the cones and this table

12   that you saw.  Okay?

13       A.   Uh-huh.

14       Q.   Thank you.

15            MR. LOREN:  Bring you some crayons?

16            THE WITNESS:  I know.  I need them.

17       Q.   (By Ms. Jones)  You never know what you'll

18   be asked to do in a deposition, Ms. Rowell.  Always

19   come prepared.

20       A.   I see.  I see.  I believe that's about it.

21   There was some kind of -- some kind of thing here.

22   Some kind of sale box.  I know it pretty well.  Okay.

23   And then back around this way.  And there's a little

24   thing here.  Hot fudge and stuff.  Right here.

25       Q.   Let me say something.  You really know this

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS    Document 41    Filed 06/24/16    Page 42 of 124

March 10, 2016

Page 42

1    store, don't you?

2        A.    Yes.

3        Q.    Well, I do want to thank you for helping me

4    understand it.  I'm not familiar with this Athens

5    store, so I appreciate your help.

6        A.    Uh-huh.

7        Q.    Okay.  So -- and this will be marked as

8    Defendant's Exhibit 2.  But it looks like you were

9    coming in -- is this towards the front or the --

10        A.    This is the front, yeah.

11        Q.    Okay.

12        A.    This is, like, the pharmacy.  And then this

13    is the --

14            MR. LOREN:  Draw the pharmacy.

15        A.    -- organics.

16            MS. JONES:  She has it marked.

17            THE WITNESS:  Organics is right here.  And

18        then this would be the self-checkout.  And then

19        the regular checkouts.  And then this would be the

20        customer service.  This would be the entrance.

21        Q.    (By Ms. Jones)  Okay.  Perfect.  Have you

22    ever, like, gotten into drawing floorplans and --

23        A.    I'm trying to get my daughter into it.

24        Q.    Okay.  So you were walking and you passed

25    Aisle 18, which is the freezers, correct?

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                          March 10, 2016

Page 43

1      A.   I went into -- I was walking -- this is

2   where I turned down Aisle 18.  Turned right down Aisle

3   18.

4      Q.   Okay.

5      A.   So I went down Aisle 18.  That's where I

6   looked for the bread.  These are the freezers with the

7   bread.

8      Q.   Okay.

9      A.   And there's freezers on this side, too.  I

10  made my 18 kind of wide.

11     Q.   That's okay.

12     A.   And then --

13     Q.   You came --

14     A.   -- walked down here.

15     Q.   And this is the back aisle, right?

16     A.   This is the back aisle where the seafood is

17  down here and stuff.  Seafood and milk.

18     Q.   Okay.  Then from this --

19     A.   And bathrooms right here.

20     Q.   From this diagram or this picture, you went

21  back up the next aisle?

22     A.   Correct.

23     Q.   And the --

24     A.   The cones were right down at the bottom.

25  Like, there's a little sale freezer right here and

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 44 of 124

March 10, 2016

Page 44

 1   they have ice cream cones right here.

 2        Q.   Okay.

 3        A.   But right near the ice cream cones, like,

 4   before you even kind of turn the aisle, the cones were

 5   down at the bottom.

 6        Q.   Okay.  Did you --

 7        A.   And I went around them.  And I went to the

 8   right of the tables.  Like, the tables were taking up

 9   pretty much the middle.  Like, you can only fit a

10   cart, a shopping cart, on either side.  And so I -- I,

11   like, saw the cones and so I kind of looked around in

12   that area, 'cause they were in my direct -- you know,

13   I looked down to make sure that there wasn't any,

14   like, wet floor, like they had just mopped or

15   something.

16        Q.   Okay.

17        A.   And I looked kind of around in that area.

18   And then I went to that side, just in case I missed --

19   you know, missed where they had mopped or if there was

20   a spill or something.  So I went to the right side and

21   walked down that side of the tables.  And then this is

22   a pretty good distance.  I would say -- I thought it

23   was about 30 feet, but it's probably 40 to 50 feet

24   that I walked before I -- I turned to -- in between

25   the tables there's not -- there wasn't a lot of space.



Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                              March 10, 2016

Page 45

1   That's not -- no longer there.

2           But I turned and stepped in and reached for

3   the -- for the freezer door.  And as I reached for the

4   door, the next thing I remember is just being on the

5   floor and being -- my leg being soaked, and my arm, I

6   believe.  And I was just totally embarrassed and kind

7   of out of -- like, just overwhelmed.  Like, it's -- I

8   can't explain it.  Just...

9       Q.   I understand.  And I just want to -- okay.

10  So --

11      A.   But I remember hearing the people at the

12  pharmacy.  Like, there was a pharmacist helping a

13  client.  And she said, "Oh, my God.  She fell."  And I

14  was embarrassed and I just got up and I, you know, got

15  out as fast as I could and got on the phone with my

16  ex, so...

17      Q.   Okay.  Just a couple questions with regard

18  to your pictures.  From this picture it looks like

19  it's two cones on both sides of the -- the ends of

20  both aisle --

21      A.   Right.

22      Q.   -- the same aisle; is that correct?

23      A.   Yes.

24      Q.   So there was two cones at the back of the

25  aisle and there was two cones towards the front,



Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 46

1  towards the pharmacy, correct?

2      A.   Correct.

3      Q.   And from your picture, were the tables on

4  the same aisle as this Popsicle, Fudgsicles, ice

5  cream?

6      A.   Yes.

7      Q.   Okay.

8      A.   And this is on the opposite side of, like --

9  you know, closed in the aisle.

10     Q.   Okay.

11     A.   So the yogurt and the cheese and the juice

12  all go on this side.

13     Q.   So were the tables a product display?

14     A.   Yes.

15     Q.   Like, items that they were selling?  "They"

16  meaning Kroger.

17     A.   Yes.

18     Q.   And so from my understanding of this picture

19  and your testimony, you walked in between one of the

20  tables back to the freezer, correct?

21     A.   Correct.

22     Q.   Okay.  We're going to mark this as Exhibit

23  2.  You mentioned opening or reaching for the freezer

24  door with your hand or your arm.  Do you know which

25  arm or hand you were using?

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 47

```
 1      A.   Yes, my left.
 2      Q.   Are you left-handed?
 3      A.   No.
 4      Q.   At this point in the store, did you have a
 5 shopping cart or a handbasket?
 6      A.   No.
 7      Q.   Did you have any items in your possession at
 8 that time?
 9      A.   No.
10      Q.   Any groceries you intended to purchase?
11      A.   No.
12      Q.   Okay.
13           (Defendant's Exhibit 2 was marked for
14           identification.)
15      Q.   (By Ms. Jones)  Okay.  Do you recall which
16 foot slipped from underneath you?
17      A.   I don't recall.
18      Q.   Do you recall if you -- when you slipped,
19 did you fall to the right or to the left?  Like, how
20 did your body land or what part of your body sustained
21 the impact?  If that makes sense.
22           Like, if you reached with your left hand,
23 did you fall on the left or did you kind of turn and
24 fall on the right?  I'm just trying to get a visual.
25      A.   I don't remember.
```

Page 48

1      Q.   Okay.   Other than your pants being wet, did

2   you have any other portions of your clothing wet from

3   the fall?

4      A.   I don't remember.

5      Q.   Did your body fall -- did your body hit the

6   freezer or did you hit the floor?

7      A.   I honestly don't remember.

8      Q.   Okay.  Did you see any water on the floor

9   prior to you stepping in between the tables and

10  reaching for the door?

11     A.   No, I did not.

12     Q.   Did you see any water on the floor after you

13  reached for the door and kind of -- and sustained some

14  kind of physical impact?  Did you see any water on the

15  floor then?

16     A.   When I was getting up from the floor I saw

17  the water.  I mean, I felt it with my hands.

18     Q.   Okay.

19     A.   And I looked at it.

20     Q.   Describe to me, if you can, the amount of

21  water or the size of -- the circumference the water

22  took up on the floor or what it looked like.

23     A.   There was a great deal of water.

24  Approximately 5 feet wide of water on the floor.

25  Maybe 5 feet wide, at least 3 feet -- I mean 5 feet

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 49

1  long, like 3 feet wide.  I mean, it was a great deal

2  of water.

3       Q.   Do you know if from the pharmacy you

4  could -- anyone there could see the water from

5  where --

6       A.   I don't know.

7       Q.   Okay.

8       A.   I don't know.

9       Q.   The person you heard from the pharmacy say,

10  "Oh, my God.  She fell," did she provide any

11  assistance to you or --

12      A.   No.

13      Q.   -- ask any questions?

14      A.   No.

15      Q.   Were there any customers around that saw you

16  fall or...

17      A.   Yes.

18      Q.   Did you happen to get their names or...

19      A.   No.

20      Q.   Did they say to you, "Oh, I see the water,"

21  or anything like that?

22      A.   No.

23      Q.   Were they in this same area where the ice

24  cream --

25      A.   No.  They were at the pharmacy.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                        March 10, 2016

Page 50

1       Q.    Okay.

2       A.    And they were getting their medication.

3       Q.    Any other customers on the aisle?

4       A.    No.

5       Q.    Okay.  Could you tell from the water where

6  it was coming from?  Like, the source of the water?

7       A.    No.  There was a break in the bottom of the

8  freezer that was rusted out and cracked that I assumed

9  it was coming from.  But I didn't -- I don't know.

10      Q.    Did you notice this -- what do you mean a

11 break in the freezer?  You mean, like, a crack?

12      A.    Yes.

13      Q.    Okay.  Did you notice this crack in the

14 freezer when you were reaching initially for the door?

15      A.    No.  No.

16      Q.    When did you first notice this crack in

17 the -- and I think you're talking, if I'm not

18 mistaken, like, the fan part?  Like, the bottom part

19 of the freezer that was referring to?  Or are you

20 talking about the glass part was cracked?

21      A.    It's just -- it's -- it's below the glass.

22 It's, like, the part that --

23      Q.    The base?

24      A.    Yeah, the base part.

25      Q.    Okay.  When did you first notice that the

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

March 10, 2016

Page 51

1   base of the freezer was cracked?

2        A.   I don't remember if it was that day or if it

3   was when I went back to see where I'd fallen.

4        Q.   Okay.  So on the date of the incident you

5   didn't look at the bottom of the freezer that day, is

6   that -- or you're unsure whether you looked?

7        A.   I'm unsure whether I looked at where the

8   water was coming from.  I mean, I looked at the water.

9        Q.   Okay.  Did it look like a customer spill or

10  anything like that or...

11       A.   No.

12       Q.   Okay.  When you -- let me strike that.  Did

13  anyone help you get up from the floor?

14       A.   No.

15       Q.   And what happened after you got up from the

16  floor?  I think you said you just left the store.

17       A.   Yes.  I was embarrassed and just out of

18  sorts.

19       Q.   Okay.  Did you -- as you're leaving the

20  store, did you tell anyone that you had fallen or that

21  something was wrong back in the freezer/dairy/ice

22  cream aisle?

23       A.   I was just really confused as to what had

24  happened and I just, like, went out the door to, like,

25  gather myself and got on the phone.  And that's when

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                          March 10, 2016

Page 52

1   he told me to get back in there and tell them what

2   happened.

3       Q.   Which door did you recall leaving out of?

4   The one closest to the...

5       A.   To the cashiers.

6       Q.   Okay.  Not on the other side where the

7   Starbucks is and --

8       A.   No.  No.

9       Q.   Okay.  And that's when you went out and

10  called R.D.?

11      A.   Right.

12      Q.   And R.D. said go back inside?

13      A.   Right.

14      Q.   When you went back inside, which door did

15  you go in through, if you can recall?

16      A.   I don't recall.

17      Q.   Okay.  What did you do after you went

18  inside?

19      A.   I went to customer service and asked for the

20  manager.

21      Q.   Do you recall the lady or man at customer

22  service that helped you?

23      A.   I -- it was an older man.  I see him all the

24  time, but I don't know his name.

25      Q.   You see him in the store now?

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 53 of 124

1    A.    Yeah.  Yeah.

2    **Q.    Okay.**

3    A.    And he had a younger gentleman come over

4 there to witness.

5    **Q.    The guy at the customer service that had a**

6 **younger gentleman -- was the younger gentleman a**

7 **manager, do you know, or...**

8    A.    I don't know if he was a manager.

9    **Q.    Okay.**

10    A.    I mean, the first -- the older gentleman was

11 a manager.  I know he's a manager.  But the younger

12 gentleman, I haven't seen him since the incident

13 really.

14    **Q.    Okay.  I think I'm a little bit confused.**

15 **Okay.  The person at the customer service, that was**

16 **not a manager, correct?**

17    A.    Correct.

18    **Q.    Okay.**

19    A.    They called the manager over there.

20    **Q.    And an older man came and responded?**

21    A.    Yes.  Yes.

22    **Q.    Okay.  White or black?**

23    A.    White.

24    **Q.    Okay.  Gray hair?**

25    A.    Yes.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                March 10, 2016

Page 54

```
 1        Q.    Okay.
 2        A.    Grayish-blond.
 3        Q.    And then he called another manager over to
 4   help?
 5        A.    Correct.
 6        Q.    Okay.  White or black?
 7        A.    White.
 8        Q.    Old or young?
 9        A.    Young.
10        Q.    -ish?
11        A.    Youngish, yeah.
12        Q.    Okay.  And did either of the managers go
13   back to the aisle with you?
14        A.    No.
15        Q.    Okay.  Tell me what happened when the older
16   and the younger manager presented or came -- they came
17   to customer service?
18        A.    Yes.
19        Q.    Okay.  Tell me what happened.
20        A.    They just ask what had happened, took my
21   statement, wrote down -- I mean, they just had a piece
22   of paper and they wrote down what I said, took down my
23   name, my information, what, you know, the best number
24   to reach me at was, what I said happened.  And that
25   was pretty much it.
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell
Case 1:15-cv-00856-RWS    Document 41    Filed 06/24/16    Page 55 of 124
March 10, 2016

Page 55

```
 1             And then they just started walking.  I mean,
 2   I said, "Is that all you need?  Do I need to sign
 3   anything?"  And they're, like, "No."  And I watched
 4   them walk down.  You know, I said, "Do I need to show
 5   you where it happened?"  And they're like, "No."  And
 6   they just walked off.  I watched them walk down there
 7   and I watched the younger guy grab a cone and move it
 8   over to, like, put it -- put it over so that it
 9   blocked off the area a little bit more.  And then I
10   walked away.
11        Q.   Do you recall providing your driver's
12   license for them to take a picture of or anything like
13   that?
14        A.   No.
15        Q.   So if they had a copy of your driver's
16   license, how would you assume they got that
17   information?
18        A.   Probably when the woman called me from --
19   from -- from the main area.
20        Q.   Okay.
21        A.   She may have asked for that.  But I don't
22   believe they would have gotten a copy from me that
23   day.
24        Q.   Okay.
25        A.   'Cause, I mean, the time that they spoke to
```



Donna Rowell v. The Kroger Co., et al.
Donna Rowell
Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 56 of 124
March 10, 2016

Page 56

1   me was very brief.

2       Q.   Before I show you the incident report I want

3   to ask you a couple questions, okay?

4       A.   Uh-huh.

5       Q.   When you were talking to the managers, the

6   older and the younger manager, did you tell them by

7   number the aisle where the incident occurred or you

8   just described the area?

9       A.   I believe I just described the area.  I

10  don't believe I knew the number of the aisle.

11      Q.   Okay.  But they knew where to go based on

12  your description, correct?

13      A.   Yes.

14      Q.   And from my understanding, you did not walk

15  back to the aisle with them to show them where you

16  fell?

17      A.   Right, yeah.  Uh-huh.

18      Q.   Okay.  Other than the two managers, was

19  there anyone else that took any kind of information

20  from you as it relates to what happened or your

21  identity or anything like that?

22      A.   Not that I remember.

23      Q.   It's probably not a good copy.  But if you

24  can look at that, which is attached to the incident

25  report.  Is that your driver's license?



Donna Rowell v. The Kroger Co., et al.
Donna Rowell
Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 57 of 124
March 10, 2016
Page 57

1      A.    Yeah, that's my license.

2      Q.    Okay.

3      A.    Uh-huh.

4      Q.    And I think that's just the claim number

5  when they have to submit it.  But would you know how

6  they would have received that on the date of incident,

7  other than by you giving it to them?

8      A.    Huh-uh.  No.

9      Q.    I think earlier I asked prior to you

10 reaching for the ice cream door -- or I won't call it

11 actually -- the freezer door, you said you weren't

12 able to see the water.

13     A.    Correct.

14     Q.    Correct?

15     A.    Uh-huh.

16     Q.    Was anything obscuring your vision to see

17 the water at all?  You said it was 5 foot long and 3

18 foot wide, a great deal of water.

19     A.    Uh-huh.

20     Q.    So was there anything blocking you or

21 preventing you from seeing the water?

22     A.    I mean, the tables were in the middle of the

23 aisles.  So I couldn't see over on the other side of

24 the tables.

25     Q.    After you gave your information at customer

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                      March 10, 2016

Page 58

1   service or they took some information from you,

2   whether it be your ID or your contact information --

3        A.   Uh-huh.

4        Q.   -- did you leave the store?

5        A.   Yes.

6        Q.   So did you -- what I'm trying to figure out,

7   did you buy any groceries that day from the store?

8        A.   No.

9        Q.   Not even the bread you were coming for?

10       A.   I don't think so, no.  Huh-uh.

11       Q.   Did you have any conversation with -- as you

12  were leaving or after the managers walked away to the

13  aisle, did you have any conversation with the guy at

14  customer service about the incident at all?

15       A.   I don't remember.

16       Q.   Did you call, or did Kroger managers offer

17  to call, 911 or any kind of EMS or anything like that?

18       A.   Not that I remember.

19       Q.   Did you personally call, yourself, 911 or

20  EMS or anything like that --

21       A.   No.

22       Q.   -- from the store?

23       A.   No.

24       Q.   You mentioned that you went back to see

25  where you fell; is that correct?

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                      March 10, 2016

Page 59

```
1        A.    Uh-huh.  Yes.
2        Q.    How soon after the incident did you go back
3    to see where you fell?
4        A.    Possibly within the next few days.  I mean,
5    I go there all the time.  I mean, that's where I get
6    all my groceries still.
7        Q.    Even still today?
8        A.    Yeah.
9        Q.    Have you -- I think you mentioned you've
10   seen the older Kroger manager, just not the younger
11   one?
12       A.    Right.
13       Q.    Has anyone said anything to you about the
14   incident at all since --
15       A.    No.
16       Q.    -- it occurred?
17       A.    No.
18       Q.    And when you returned a few days after the
19   incident, did you take pictures?
20       A.    Yes.
21       Q.    Okay.  On your cell phone?
22       A.    Yes.
23             MS. JONES:  Okay.  James, I'm not sure we
24       have pictures in this case from plaintiff at all.
25             MR. LOREN:  I'm not sure that I do either.
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                              March 10, 2016

Page 60

```
 1              MS. JONES:  Okay.
 2      Q.   (By Ms. Jones)  Do you have them with you
 3  now, Mrs. Rowell?
 4      A.   I don't.  It was an old camera.  I was just
 5  trying to show my son.
 6              MR. LOREN:  Yeah.  'Cause I don't have them.
 7              THE WITNESS:  No.  And they were awful.
 8      They -- 'cause I didn't know how to work my
 9      camera.
10      Q.   (By Ms. Jones)  Okay.  Do you still have the
11  camera and/or pictures --
12      A.   I don't.
13      Q.   -- in your possession?
14      A.   I don't.
15      Q.   Okay.  Other than this time where you
16  attempted to take pictures, any other time you've been
17  back to the store to take pictures or investigate the
18  area at all?
19      A.   I mean, I've just looked around, yes.  Yeah.
20      Q.   When you returned and tried to take pictures
21  the day -- a couple days after the incident, you
22  mentioned that there was a crack in the base or
23  something like that.
24      A.   Uh-huh.
25      Q.   Did you see whether or not there were cones
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 61

1  still at the aisles or had anything changed?

2       A.   Oh, yes.

3       Q.   Okay.  Tell me what happened.

4       A.   Yes, they had removed the tables that were

5  blocking the aisle.  They had also put up rolls, these

6  long -- long, like, cloth rolls, I guess, that would

7  soak up the water.  All along the base of the

8  freezers.

9       Q.   Anything else changed?

10      A.   Not that I can think of.

11      Q.   Do you know if those cloth rolls were

12 present on the date of the incident?

13      A.   No, they were not.

14      Q.   Do you recall -- I mean, could it have been

15 that they were there and you just didn't see them?

16      A.   No.

17      Q.   You're a hundred percent certain?

18      A.   Oh, yes.

19      Q.   Anything else changed?  Removed the tables

20 and the rolls.  That's about it, that you can

21 remember?

22      A.   Yes.

23      Q.   Okay.  And in your camera that you would

24 have had for taking pictures, would you have taken

25 pictures of the rolls, too, that you said were there?

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 62

```
 1      A.   Probably.

 2      Q.   Okay.  Do you know what color they were?

 3      A.   Like a grayish color.  Grayish, light blue

 4  color.

 5      Q.   Okay.  Did you -- during this subsequent

 6  visit, did you talk to anyone at all about the

 7  incident?

 8      A.   I don't recall.

 9      Q.   Did anyone say, "Hey, Ms. Rowell.  We know

10  you fell last week"?  Did anyone acknowledge --

11      A.   No.

12      Q.   -- that it was you?

13      A.   No.

14      Q.   Okay.  So it was just business as usual?

15      A.   Yeah.  Yeah.  Uh-huh.

16      Q.   And I want to make sure that you're not

17  being treated unfairly or anything like that.

18      A.   No, no, no.  Huh-uh.

19      Q.   You still could take advantage with ten for

20  ten and all that stuff, right?

21      A.   Oh, yes.  Yes.

22      Q.   Okay.  When did you first -- between the

23  time where the incident occurred and then when you

24  went back to the store, did you receive any kind of

25  medical treatment at all?  Like, was it -- did you --
```

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 63 of 124

Page 63

1      A.   Say that again, I'm sorry.

2      Q.   Okay.  From -- let me ask it a better way.

3  When did you first receive any kind of medical

4  treatment as relates to your injuries sustained...

5      A.   As soon as I left the store.

6      Q.   Okay.  Where did you go?

7      A.   I went to Athens Orthopedic Clinic.

8      Q.   Do you recall the doctor that treated you on

9  that day?

10      A.   I don't.

11      Q.   Okay.  Tell me when you went to Athens

12  Orthopedic, what kind of complaints were you having or

13  what kind of complaints of pain were you experiencing?

14      A.   The first day that I went, it was my left

15  hand, left wrist and hand, that was extremely painful.

16      Q.   And that was the hand that you initially

17  grabbed...

18      A.   Correct.

19      Q.   Did anyone at Athens take any kind of x-rays

20  or any kind of records, like diagnostic films?

21      A.   I don't remember.

22      Q.   Did they diagnose you with anything there?

23  The first day at Athens Orthopedic.

24      A.   I don't believe so.  They -- I believe they

25  just put a splint on it.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 64 of 124

March 10, 2016

Page 64

1      Q.   And you were released the same day?

2      A.   Yes.

3      Q.   Given pain medication?

4      A.   Probably.  I don't remember.

5      Q.   Okay.  I understand.  And you're doing a

6   great job of -- my memory is shot.  So you're doing a

7   great job.

8           Were you told to follow up with your primary

9   care physician or anything?  Like, follow up with them

10   or how did it work?

11     A.   I was told to follow up with them in a week

12   or two.

13     Q.   Do you have a primary care physician that

14   you normally see?

15     A.   Yes.  Dr. Gibson.

16     Q.   Did you tell Dr. Gibson at all about the

17   incident on that day that it occurred?

18     A.   No.

19     Q.   Did you in fact follow up with Athens

20   Orthopedic the week later, as recommended?

21     A.   I came back the next day.

22     Q.   And tell me why you'd come back the next

23   day.

24     A.   Because later on that evening my pain became

25   so severe in my neck and my shoulder.  My back,

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 65 of 124

March 10, 2016

Page 65

1  shoulder blade, and down to my elbow was just, like,

2  pulsing and throbbing and burning and just unbearable.

3  And so I went back and they asked me why I didn't wait

4  until the following week.  And I told them I couldn't

5  wait to have it checked 'cause it was so painful.

6       Q.   And the shoulder and elbow, was it your left

7  or right shoulder?

8       A.   It was my right.

9       Q.   Do you recall on the day of incident whether

10  you sustained any impact to your right portion of your

11  body at all?

12       A.   I don't remember how I fell.

13       Q.   But you know that the night of April 30th

14  you were having pain on the right side?

15       A.   Correct.

16       Q.   Okay.  What did the doctors or professional

17  at Athens Orthopedic do when you came back for the

18  right shoulder and elbow pain and the neck pain?

19       A.   I remember being put in, like, a -- a sling.

20  I think they x-rayed.  And I -- I truly don't

21  remember.  It's been so long.

22       Q.   Okay.  Do you recall being diagnosed with

23  anything or did they say, "Ms. Rowell, you have X"?

24  Like, any kind of diagnosis or --

25       A.   (Witness shakes head negatively.)



Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 66

```
 1      Q.   -- statements concerning your condition?

 2      A.   No.

 3      Q.   So other than the sling, anything else they

 4   give you or...

 5      A.   (Witness shakes head negatively.)

 6      Q.   Okay.

 7      A.   No.

 8      Q.   Any more pain medication prescribed at all?

 9      A.   No.

10      Q.   Did anyone go over the results of the x-ray

11   with you?

12      A.   I'm sure they did if there were x-rays

13   taken.

14      Q.   Other than those two visits to Athens

15   Orthopedic, tell me, I guess, what other type of

16   treatment you've received for -- strike that.

17           If I'm not mistaken -- I want to make sure I

18   understand what your injuries were after the incident.

19   So if you can, just tell me exactly where you believe

20   your injuries to be as a result of the Kroger

21   incident.

22      A.   My injuries are to my neck, to my shoulder,

23   my -- my clavicle, my rotator cuff, and my elbow where

24   the nerve was pinched.

25      Q.   All on your right side?
```



Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                              March 10, 2016

Page 67

 1     A.   Yes.

 2     Q.   So --

 3     A.   And my left wrist.

 4     Q.   **Okay.  The neck -- right side of your neck.**

 5     A.   Yes.

 6     Q.   **Right shoulder, right clavicle, right**

 7     **rotator cuff, right elbow, and then the left wrist.**

 8     A.   Yes.  And actually, because of the surgery

 9     that they did on my neck, they took a piece from my

10     iliac crest bone in my hip and I now have problems

11     with that, pain from that, which I don't know if that

12     counts or not, but...

13     Q.   **I'm sorry.  You're making my neck hurt.**

14     **Okay.**

15     A.   Mine feels better now, now that they gave me

16     cortisone, or Botox.

17     Q.   **Okay.  So did you solely just treat at**

18     **Athens Orthopedic for your injuries?**

19     A.   Yes.

20     Q.   **And other than the sling and the splint that**

21     **you have, any other kind of treatment or -- I think**

22     **you mentioned a surgery?**

23     A.   Could you repeat that?

24     Q.   **Okay.  So other than the sling that you got**

25     **for your right elbow and arm, and then you had the**

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                      March 10, 2016

Page 68

1  splint for your wrist -- your left wrist, right?  Any

2  other kind of treatment that you received?  I know --

3  I think you said a surgery.  So tell me about the

4  surgery you had, or surgeries plural.

5      A.   Yes.  I had a cervical fusion done in

6  September for my neck.  They went in through the front

7  and did a cervical fusion.  And then they did where

8  they went in and shaved my clavicle, or something like

9  that, and repaired the rotator cuff tear in November.

10 And then in December of that same year they went in

11 and -- I guess, they called it "cubital tunnel."  But

12 they went in and unpinched the nerve in my elbow.

13     Q.   Okay.

14     A.   So I was in a neck brace for two months,

15 then I was in a sling, then I was in, like, a long

16 splint, I guess.

17     Q.   Okay.  And did all of these take place in

18 2014 or 2015?

19     A.   2014.

20     Q.   Okay.  So your cervical fusion is September

21 2014.  The clavicle, would that be the same time they

22 did the rotator cuff?

23     A.   Right.

24     Q.   And do you remember the month?  I think...

25     A.   I believe that was November 18th.



Page 69

1        Q.   Okay.  And then --

2        A.   And then the pinched nerve was December

3   23rd, I believe.

4        Q.   Okay.  Prior to having any surgeries, did

5   you have any MRIs taken of your cervical spine or of

6   your --

7        A.   Yes.

8        Q.   -- right shoulder?

9        A.   Yes.

10       Q.   Okay.  Do you recall a medical doctor or

11  someone going through the results of those MRIs with

12  you?

13       A.   Yes.

14       Q.   From your understanding, what do you recall

15  them saying you had or what were your conditions that

16  they were operating on?

17       A.   With the cervical -- I don't know what you

18  call it.  The cervical spine.  They said that there

19  was some degeneration, but that where they were

20  repairing was from where there was trauma because of

21  an incident where it had -- the way they explained it,

22  it was from a traumatic incident, that they had to

23  repair that.  That's why they were going to do that

24  fusion on the three levels that they said.  That that

25  needed to be repaired now, but that the degeneration

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                  March 10, 2016

Page 70

1   could wait ten years.

2        Q.   Okay.  What --

3        A.   But that that was causing -- that that could

4   be causing the pain that was going down into my

5   shoulder blade and across my -- my shoulder and down

6   into my arm.  That's why they wanted to do the

7   cervical fusion first to see if that took care of the

8   pain that was going down my arm and down into my upper

9   back.

10       Q.   What levels, if you can recall, did they --

11  "they" meaning the doctor -- operate on?

12       A.   Uh-huh.  I believe it was C -- I don't

13  remember.  I believe it was C4, 5, 6.

14       Q.   Okay.  And...

15       A.   And they took a piece of my iliac crest to

16  put into my neck.

17       Q.   Okay.  And for your MRI for your right

18  shoulder, what did they say, if you can recall, or of

19  your -- to your best of your knowledge or

20  understanding, what did they say was wrong with your

21  right shoulder?

22       A.   They told me that the collarbone was

23  fractured and that there was a tear in my rotator

24  cuff.  And they had tried to do numerous, like,

25  guided -- they call it "guided epidural injections" or



Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                                March 10, 2016

Page 71

1   different types of injections to try to stop the pain.

2   And since that wasn't working, they wanted to go in

3   and repair.  And they shredded the -- or shaved the

4   tip of the collarbone so that it wouldn't hit.  I

5   don't -- I didn't really understand it.  But so that

6   it wouldn't hit my shoulder so that it wouldn't hurt

7   so much.

8       Q.   How many series of the epidural injections

9   did you have, if you can recall?

10      A.   I know the guided one was just once or

11  twice.  But I had cortisone shots a couple times.

12      Q.   Were these cortisone shots similar to the

13  ones you had in your knees at some point earlier?

14  Like the -- does that make sense?

15      A.   Uh-huh.  Yeah.  Well, I had those also in my

16  neck before they did the surgery there, too.

17      Q.   Were these self-administered shots or --

18      A.   No, no, no.  They were, like, ultrasound

19  guided.

20      Q.   Okay.  I just didn't know -- like, I think

21  about -- like, my grandmother is diabetic.  She gives

22  herself insulin.

23      A.   Huh-uh.  Huh-uh.

24      Q.   I didn't know if it was something like --

25      A.   No.



Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                      March 10, 2016

Page 72

```
 1        Q.   -- something you do on your own.
 2        A.   No.  No, they go right into the joint --
 3        Q.   Oh, okay.
 4        A.   -- and into -- through the bone -- in
 5   between the bones and into the joint.
 6        Q.   Knock on wood, I never had to have it.
 7   Okay.  What did -- if you can recall, did a doctor or
 8   medical professional say about the clavicle, your
 9   clavicle?  Do you recall if they said anything about
10   that or...
11        A.   That it was fractured.
12        Q.   Okay.  Just a fractured clavicle.  And what
13   about the pinched nerve in your elbow?  Did they say
14   what it was caused from?  Any kind of doctor say it
15   was attributed to X or attributed to Kroger or...
16        A.   They just said it was probably caused when I
17   fell.
18        Q.   As we sit here today, are you in any pain?
19        A.   I mean, I'm in pain every day.  I take
20   medication to control it.
21        Q.   And when you say you're in pain every day,
22   tell me about that.  And pain -- is it still the neck,
23   the shoulder?
24        A.   Yes.
25        Q.   Okay.
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 73 of 124

March 10, 2016

Page 73

1        A.    Yes.  I mean, if I'm sitting for too long

2    it's, like, my -- the hip from the iliac crest starts

3    hurting.  Walking up and down stairs it'll start

4    hurting.  I mean, just from me pushing on -- just

5    from --

6        Q.    Don't do it.

7        A.    -- you know, pointing it out.  It hurts now

8    just from -- from doing that.  If I, like, move my arm

9    too much or something, it, like, irritates the bone.

10   And just from writing or if I'm typing or something

11   like that, it irritates the bones in there for some

12   reason.  Right now my migraines are controlled with

13   the Botox, so I haven't had too much of a problem with

14   that.  But before they did the Botox, I had migraines

15   continuously every day since they did the surgery

16   because of the -- the -- the neck problem.

17       Q.    Okay.

18       A.    But I didn't have any -- I had never had

19   headaches or migraines before I fell.

20       Q.    Okay.  So the migraines -- has a doctor or

21   medical professional attributed that to your Kroger

22   incident?

23       A.    Yes.

24       Q.    Okay.  And who was that?

25       A.    Dr. Julian Price.



Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 74 of 124

March 10, 2016

Page 74

```
 1      Q.   Dr. Price.

 2      A.   Yes.

 3      Q.   Did Dr. Price also attribute your cervical

 4  pain and injury to the Kroger fall?

 5      A.   Yes.

 6      Q.   And that would go for the rotator cuff?

 7      A.   Rotator cuff is Dr. Hancock.  I also see

 8  Athens Spine -- Spine -- Athens -- Athens Pain & Spine

 9  Clinic for, like, my medications now.  And they also

10  agreed with that.

11      Q.   Athens Spine Clinic?

12      A.   Athens Pain & Spine Clinic.  Athens.

13      Q.   Is it Spine Care & Pain Management?

14      A.   Yes, yes.

15      Q.   Okay.

16      A.   I'm sorry.

17      Q.   I know.  It's okay.  I just want to make

18  sure.  And who's the doctor there at Spine Care?

19      A.   Brian Adams.

20           MR. LOREN:  What did you say?

21           THE WITNESS:  Excuse me?

22           MR. LOREN:  Brian Adams?

23           THE WITNESS:  Yes.

24           MR. LOREN:  Is he related to Bryan Adams?

25           THE WITNESS:  I don't believe so.
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                   March 10, 2016

Page 75

1       Q.    (By Ms. Jones)  Other than -- other than

2    Rite Aid, are you getting your prescriptions filled

3    anywhere else?

4       A.    Just at the Athens Spine Care & Pain Clinic.

5       Q.    Okay.  Has anyone ever told you that you

6    would need any kind of future treatment or anything

7    like that related to your injuries?

8       A.    I'm not sure what you mean by that.

9       Q.    Meaning other than your two surgeries

10   you've -- three, if we count the --

11      A.    Uh-huh.

12      Q.    -- pinched nerve --

13      A.    Uh-huh.

14      Q.    -- and your cortisone shots, has anyone

15   said, "Okay, Ms. Rowell.  You will need this in the

16   future," or, "You will continue to need cortisone

17   shots," or anything like that?  Any kind of future

18   treatment?

19      A.    I mean, they believe that -- I've been told

20   that I'll need to continue with the Botox for the

21   migraines.  And that I'll probably need, like, a low

22   dose of pain med -- pain medicine and nerve -- nerve

23   pain medicine.  But hopefully that I can taper down on

24   the pain medicine.  And they want me to go back to

25   physical therapy.



Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 76 of 124

March 10, 2016

Page 76

1     Q.   Okay.  When was the last time you received

2  any treatment at all for any injuries related to the

3  subject incident?

4     A.   Treatment as far as...

5     Q.   Treatment as far as, I mean, you went to the

6  doctor, even if it was a call to the doctor about any

7  kind of pain or discomfort.  Anything.

8     A.   Well, I go to see -- to pain management once

9  a month.  But as far as -- like, I went for Botox two

10 months ago.

11       MS. JONES:  James, I don't think we have any

12    of those records.  The last time we have treatment

13    is 2015.  So if she's still treating...

14       MR. LOREN:  Yeah, we'll get them updated.  I

15    mean, quite frankly, it would be worthwhile just

16    to get a subpoena issued just because it'll be

17    faster.  But, I mean, I...

18       MS. JONES:  Okay.  But that's even in the

19    discovery responses that you -- I mean, if she --

20       THE WITNESS:  I mean, they just started

21    sending me there.

22     Q.   (By Ms. Jones)  Okay.  And who is "they"?

23 Who sent you to Pain --

24     A.   The Athens Spine Care --

25     Q.   Okay.



Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 77 of 124

March 10, 2016

Page 77

```
 1        A.   -- & Pain Management.  Or actually, it
 2   was -- it was Dr. Gibson sent me to Athens Spine Care.
 3        Q.   And where is Dr. Gibson's practice?
 4        A.   It's on Prince Avenue.
 5        Q.   Is he with Athens Orthopedic?
 6        A.   No, he's with -- he's my primary care.
 7        Q.   And where is -- does he have his own
 8   stand-alone office or is he with, like, a hospital or
 9   something like that?
10        A.   No, he's -- he's got his own.  It's Prince
11   Avenue Primary Care.
12        Q.   Prince Avenue Primary Care?
13        A.   Primary Care, yeah.  Because I was concerned
14   with -- that the medication may be too strong and that
15   it was causing problems with my memory.  So he sent me
16   there to -- to have them check out the medicine to
17   see.
18        Q.   Has anyone ever told you that you may be
19   addicted to any kind of pain medication?  You said
20   something about the amount of pain medication, they
21   want to lower it.  So is it because it's too much or
22   you've become addicted to it or anything like that?
23        A.   No, it wasn't that.  I just felt like --
24   like -- when I was driving, I felt like -- I didn't
25   like the way I felt.
```



Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                                March 10, 2016

Page 78

```
 1        Q.   Didn't feel like yourself?

 2        A.   Yeah.  Exactly.

 3        Q.   You mentioned the impact on your memory.

 4   What do you mean by that?  Like, it would cause you

 5   to --

 6        A.   No.  Like, I just felt dazed sometimes when

 7   I was -- when I was driving, like, to just go to the

 8   store or go to -- I don't know, pick up my grandbaby

 9   or something.  I'd just, like, kind of drift off, you

10   know.  You know how you just kind of...

11        Q.   Yeah.

12        A.   Sometimes you're driving and you forget that

13   you saw something on the road or something.  I don't

14   know.

15        Q.   Dr. Price, did he perform the cervical

16   fusion?

17        A.   Yes.

18        Q.   And that was at St. Mary's Hospital?

19        A.   Yes.

20        Q.   Dr. Hancock performed the surgery on your

21   shoulder?

22        A.   Yes.

23        Q.   Have you had any subsequent falls or any

24   kind of subsequent incidents after the Kroger incident

25   that you can recall?
```



Elizabeth Gallo
COURT REPORTING, LLC

Donna Rowell v. The Kroger Co.; et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 79 of 124

March 10, 2016

Page 79

1        A.    No.

2        Q.    Have you ever been told -- I think you

3   mentioned the degenerative disc disease that one of

4   the doctors may have mentioned in your cervical spine,

5   right?

6        A.    Uh-huh.

7        Q.    Do you understand what that means or did the

8   doctor explain to you what that means?

9        A.    Just that with age that your bones start to

10  deteriorate.

11       Q.    Pretty much.

12       A.    Yeah.

13       Q.    Did anyone -- Dr. Hancock or anyone talk

14  about a torn rotator cuff that might have existed in

15  your arm prior to the Kroger incident?

16       A.    He said it was a possibility that -- that

17  people over time can have a tear in their rotator cuff

18  if they do a lot of physical activities or work --

19  lifting and things like that.  But that's not the case

20  with me.  I've never done any type of physical hard

21  labor or any type of things like that where I was

22  doing that type of work.

23       Q.    Okay.  But he mentioned that you can have a

24  rotator cuff and not need --

25       A.    Yeah.



Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                     March 10, 2016

Page 80

1       Q.    -- a rotator cuff tear and not even know?

2             MR. LOREN:  Objection to form.

3       A.    No, he didn't say that.

4       Q.    (By Ms. Jones) Or did he say that you could

5  have a rotator cuff tear without sustaining traumatic

6  injury, like a Kroger incident?

7       A.    No, he didn't say that.

8       Q.    Okay.  But you mentioned -- I think you said

9  he said you can do stuff -- you could have a tear

10 based on just lifting or strenuous activity or any

11 kind of physical activity?

12      A.    That you can get a --

13      Q.    Okay.

14      A.    -- a rotator cuff [sic] with lifting and

15 doing strenuous activity, yeah.  Playing football or

16 lifting heavy items or things like that.

17            I'm sorry, but I have to interrupt because

18 I'm watching that water --

19      Q.    Look at --

20      A.    -- totally fill that table.

21            MS. JONES:  We can go off the record for a

22       minute.

23            (A recess was taken in the deposition at

24       12:43 p.m., and the deposition was resumed at

25       12:49 p.m.)

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS    Document 41    Filed 06/24/16    Page 81 of 124

March 10, 2016

Page 81

 1      Q.   (By Ms. Jones)  I think before we took a

 2   break we were talking about your primary care

 3   physician, Dr. Gibson, and the recommendation for the

 4   Botox and then maybe low dose of meds for nerve pain,

 5   correct?

 6      A.   Okay.  Let me think.  I'm trying to think of

 7   why he sent me over there.  I was concerned because I

 8   wasn't used to taking so much medication, that I felt

 9   like I was taking too much medication.  And I didn't

10   want to be around my kids with taking all that

11   medication, and being around my grandchildren.  And

12   there was a couple times that I felt overwhelmed when

13   I was driving.  And a lot of times it was, like, you

14   know, being over -- like, the heat, overwhelmed with

15   the heat and stuff like that, and feeling like I was

16   just out of sorts.  You know, just too much heat.

17      Q.   Okay.

18      A.   Yeah.  And so I just wanted to -- to make

19   sure that, you know, it wasn't messing with my mind

20   and my thoughts and things like that.  That it wasn't,

21   like, causing any type of brain damage or anything to

22   my body, you know.  So that's why he sent me over to

23   Athens Neurology.  And he knew also that it was

24   causing a lot of, like, migraines and things like

25   that.  So he wanted to see if there were different



Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 82 of 124

March 10, 2016

Page 82

 1  options available so that I didn't have to take all

 2  the medication.  That's when they started the Botox.

 3      Q.   Has any doctor said it will or has impacted

 4  with your mind at all, the medication?

 5      A.   No, it hasn't.  They said it's fine.

 6      Q.   Okay.  Have you paid any money out of pocket

 7  for any treatment you received in this case regarding

 8  your injuries?  Meaning when you go to the doctor, do

 9  you have to pay any kind of copay or did you pay out

10  of pocket for your surgeries or anything like that?

11      A.   No.

12      Q.   Do you know if there's any kind of liens

13  or -- lien or medical lien for any of the treatment or

14  surgery that you've received in this -- related to

15  your injuries in this case?

16      A.   I'm not sure what you mean.

17      Q.   Has there -- have you received any letter or

18  document saying that we are -- from a medical

19  provider.  Usually it'll come from a doctor's office

20  or something and it'll say, "We are trying to collect

21  X amount of dollars for treatment rendered to you on

22  this day."  Have you received any kind of

23  documentation like that?

24      A.   No.

25      Q.   And if I'm not mistaken, the last time you

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 83

1  treated would have been, like, a month ago at the pain

2  management place?  Is that what you...

3        A.   Correct.

4        Q.   Okay.  And so are you scheduled to go back

5  this --

6        A.   Next week.

7        Q.   Okay.  So this month?

8        A.   Yes.

9        Q.   And is that the time you'll get the Botox

10 shots or you'll get cortisone injections?  What do

11 they do when you go?

12       A.   No, it's just my regular visit.  They just

13 check to make sure my medication is doing okay.

14       Q.   Okay.

15       A.   Occasionally they'll, like, do tests where

16 they check my nerves.  They do this test where it

17 checks through my body to see where the pain signals

18 are coming from and things like that.

19       Q.   And when they perform these tests, do they

20 tell you where they believe the pain signals are

21 coming from or the pain is coming from?

22       A.   No.

23       Q.   Okay.

24       A.   They may refer me to, like, physical therapy

25 or -- or they'll tell me to go back to my doctor and,

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                  March 10, 2016

Page 84

1  you know, have referrals for me for different things.

2       Q.   So it's an ongoing treatment that you're

3  receiving?

4       A.   Yes.  Yes.

5       Q.   Has any doctor ever said, "We anticipate you

6  to be fully healed or completed from treatment in X

7  amount of months or years"?

8       A.   No.  No.  Actually, last month I did get a

9  cortisone shot for my hip.  I forgot that.

10      Q.   Have you -- or were you involved in any kind

11 of motor vehicle accidents in the past ten years?

12      A.   No.

13      Q.   You're not making a claim for lost wages in

14 this case, are you?

15      A.   No.

16      Q.   Okay.  I just have to ask.

17      A.   Yeah.

18      Q.   I don't want to go to trial and then all of

19 a sudden you say, "I haven't been able to work."

20      A.   Right.

21      Q.   Has your level of activity as far as just

22 your personal social life, has that changed at all --

23      A.   Yes.

24      Q.   -- since the subject incident?  Okay.  Tell

25 me how it's changed.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 85 of 124

March 10, 2016
Page 85

1      A.   I'm not able to leave the house as much as I

2   used to.  The sunlight bothers me.  I'm not able to

3   play with my grandchildren the way I used to be able

4   to.  Like, getting down on the floor, rolling around

5   with them.  I'm not able to crawl around or hold them

6   on my back or lift them up, carry them on that right

7   side.  I can't really hold much of anything with any

8   weight to it on my right side without it, like,

9   causing pain for a few days after the fact.

10          Sleeping.  I have to sleep in a set position

11  because it's just -- I won't get any sleep if I don't

12  sleep in a set position because it's just too

13  uncomfortable.

14          I can't type or read because of my neck

15  position or, you know, it'll cause migraines or my arm

16  will get sore.

17          I used to play basketball.  I'm not able to

18  do that anymore because standing hurts for any period

19  of time.  Well, I can't say any period of time.  If

20  I'm standing or walking for probably more than 20 to

21  30 minutes or longer, then I start having, like, a lot

22  of hip pain.  What else...

23      Q.   Okay.  I want to go back and just ask you a

24  couple things.  You said you're unable to leave your

25  house.  Why are you unable to leave your house?



Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                      March 10, 2016

Page 86

    1            MR. LOREN:  Objection.  Form.
    2       **Q.  (By Ms. Jones)  You can answer the question.**
    3       A.   I don't think I said it quite like that.  I
    4   think I said I was unable to leave the house because
    5   the sunlight bothers my eyes.
    6       **Q.   Okay.  Well, let me ask you this.  How does**
    7   **the sunlight bothering your eyes affect or impact or**
    8   **has any relation to your injuries resulting from**
    9   **Kroger?**
   10       A.   Because the injury to my neck has caused me
   11   to have migraines, which when I go out in the sunlight
   12   it bothers my eyes to the point that it makes the
   13   migraines worse.  So therefore, I stay in the house so
   14   that my eyes are covered.  A lot of times I'm on a
   15   couch with my arm over my eyes, trying to break down
   16   the light that's going to my eyes.
   17       **Q.   Has any doctor or medical professional**
   18   **prescribed or recommended any kind of treatment as it**
   19   **relates to your sensitivity to light?**
   20       A.   The Botox and the topiramate, yes.  And
   21   they've tried other things, but I was actually
   22   allergic to them.
   23       **Q.   Tried other things like what?**
   24       A.   Other medications, other oral medications,
   25   but I had an allergic reaction where I broke out in

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 87 of 124

March 10, 2016

Page 87

1  hives all over my body.

2      Q.   The topiramate, what does that do, from your

3  understanding?

4      A.   It's supposed to -- it's supposed to lessen

5  the amount of migraines that I have or the -- the

6  effect of the migraine.

7      Q.   Okay.  You mentioned walking.  Like,

8  sometimes you're -- I guess, the amount of time you're

9  able to walk or duration is 20 to 30 minutes before

10  you start to feel discomfort; is that correct?

11     A.   Pretty much, yes.

12     Q.   Is it the discomfort in your hip that's --

13     A.   Yes.

14     Q.   Okay.  Has any doctor or medical

15  professional said anything or recommended any kind of

16  treatment related to the discomfort?

17     A.   No.  They said that what they believe it is,

18  is something they call "referred pain," which can be

19  caused from when they take the bone from the iliac

20  crest and put it in your neck, some people experience

21  this type of pain and some people don't.

22     Q.   Okay.  So it's some -- I mean --

23     A.   And there's nothing they can do about it.

24     Q.   Okay.  Has --

25     A.   And there is one medication they gave me as

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                March 10, 2016

Page 88

1   a trial period that actually helped with the pain so

2   much and Medicare won't cover it for me.

3        Q.   Okay.

4        A.   So...

5        Q.   Has any doctor recommended you use, like, a

6   walker or a cane now --

7        A.   No.

8        Q.   -- because of the hip pain and discomfort?

9        A.   No.

10       Q.   Okay.  So it's pretty much you just have to

11  live with it type of thing?

12       A.   Yes.

13            MS. JONES:  Okay.  We can go off the record.

14            (A recess was taken in the deposition at

15       1:00 p.m., and the deposition was resumed at 1:02

16       p.m.)

17       Q.   (By Ms. Jones)  In the last break, before we

18  took the break, we were talking about your hip pain

19  and not really having any medication for it other than

20  what you had as a trial.

21       A.   Uh-huh.

22       Q.   Right?

23       A.   Correct.

24       Q.   Okay.  And you mentioned also you used to

25  play basketball.  Are you talking about as a child or

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 89

 1   as an adult you were playing basketball?

 2        A.   As an adult with my daughter and my son,

 3   yeah.

 4        Q.   Okay.  And you're saying based now on your

 5   injuries you're not able to play basketball anymore?

 6        A.   I can't say I'm not able to.

 7        Q.   Okay.

 8        A.   I can't play very well, the way I used to.

 9   And it hurts for me to, like, throw the ball.  And

10   because I'm right-handed it's not very easy for me to

11   dribble or --

12        Q.   So you're not winning now.

13        A.   -- run or -- exactly.  Exactly.  My daughter

14   thinks she's good now.  Yeah.

15        Q.   Now, Ms. Rowell, I'm just going to go

16   through some other questions that I have.  It may be

17   out of order, but I just want to make sure I address

18   everything, okay?

19             If we're looking at Defendant's Exhibit 2, I

20   believe it's your testimony that there were not --

21   there were no cones in between the area where you fell

22   or --

23        A.   No.

24        Q.   -- where you sustained the injury, correct?

25        A.   Yeah.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 90 of 124

March 10, 2016

Page 90

1    Q.   Okay.

2         MR. LOREN:  You've got to speak up.  You

3    can't go "uh-huh."

4         THE WITNESS:  Excuse me?

5         MR. LOREN:  You've got to give an audible

6    response.  You can't go, "uh-huh."

7         THE WITNESS:  Oh, okay.  No.

8    Q.   (By Ms. Jones)  Okay.  When you see a

9    caution cone, what does that mean for you?  When you

10   saw the cones at the aisle, at the end of the aisles

11   you were walking to, what did that mean or what did

12   that signal for you?

13   A.   When I saw the cones I assumed that there

14   was either -- that they had either just washed --

15   mopped the floor, or that something had just been

16   spilled there or in the near -- near area.  That there

17   was something spilled or something on the floor

18   nearby.

19   Q.   How --

20   A.   You know, within a certain radius.

21   Q.   Okay.

22   A.   Five, ten feet, something like that.

23   Q.   Okay.  And how far was the cones from where

24   you actually fell, would you estimate?

25   A.   How close were the cones?

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

 1      Q.   How close or far away from where the
 2 incident happened were the cones?
 3      A.   The cones that I walked past were more than
 4 30 feet away from where I fell.
 5      Q.   Okay.  And again, in your Defendant's
 6 Exhibit 2, could you see the cones that appeared to be
 7 at the front part of the aisle -- excuse me -- towards
 8 the pharmacy?  Could you see those from where you were
 9 standing or as you were --
10      A.   No.
11      Q.   -- walking up the aisle?
12      A.   No, I could not.
13      Q.   Did you see them as you were walking down
14 this front aisle headed out the door after you
15 initially fell?
16      A.   Yes.  Once I turned the corner, after I got
17 up from falling and I turned the corner, and -- like,
18 after I went -- going past the pharmacy, I saw them at
19 the top of the aisle.  Like, at the top of this
20 freezer, that sale freezer again.
21      Q.   Okay.
22      A.   Yes, there was two more cones right there.
23      Q.   Okay.
24      A.   But they moved them.  When I was leaving
25 they moved them over.  I saw them --

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 92

1      Q.   Do you know where they moved them?

2      A.   I saw them move one of the cones over in

3  front of that aisle.

4      Q.   In front of...

5      A.   Of -- of, like, this aisle right here.

6      Q.   Okay.  So closer to this end table?

7      A.   Yes.

8      Q.   Okay.  Now, you mentioned that your pants

9  were wet, but I think you also testified that you

10  weren't sure if you fell to the ground.  Can you

11  clarify to me whether or not you actually fell to the

12  ground after you grabbed the freezer with your left

13  hand?  Do you recall whether or not you fell to the

14  ground, meaning the floor part of the building?

15      A.   I don't remember saying that I didn't fall

16  to the ground.

17      Q.   Okay.  I have a note here that you -- it

18  says unsure whether you fell into the freezer or the

19  ground.  But I want to clarify.  Like...

20      A.   I don't remember ever saying that I fell

21  into the freezer unless I was saying that my arm fell

22  into the freezer.  But I know I fell to the ground.

23      Q.   Okay.

24      A.   I know I hit very hard 'cause I felt extreme

25  pain when I fell.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

March 10, 2016

Page 93

 1      Q.   Right away?

 2      A.   Yes.

 3      Q.   Okay.  And where did you feel the immediate

 4 pain?

 5      A.   I mean, the immediate pain was my arm -- was

 6 my wrist.  But I know -- I mean, I knew I fell, you

 7 know, to the right.  I'm quite sure I hit this arm.

 8      Q.   Okay.

 9      A.   Yes.  Like, trying to steady myself.

10      Q.   When you were on the ground, was your arm

11 still grabbed onto the handle?

12      A.   I have no idea.

13      Q.   Okay.  Had you ever had an MRI or any kind

14 of x-ray of your cervical or -- spine or your right

15 shoulder prior to your incident at Kroger?

16      A.   Not that I remember.

17      Q.   So if there's something in your medical

18 records from December 2012, you wouldn't recall ever

19 having an MRI or anything like that?

20      A.   I don't remember that.

21      Q.   Okay.  The fall at your brother's house, did

22 it occur in April 2013 or do you recall around what

23 time -- the approximate time that it occurred?

24      A.   No, I didn't -- I was not in my brother's

25 house in April of 2013.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 94

 1      Q.   Do you remember a fall at all that occurred
 2  in April of 2013?
 3      A.   I don't remember that.
 4      Q.   Okay.  Do you recall telling a doctor or
 5  medical professional that you had a fear of falling or
 6  concerned with frequent falling?
 7      A.   No.
 8      Q.   Other than the employee that was at the
 9  pharmacy, did you see any other Kroger employees prior
10  to or immediately after your incident?  Did you see
11  any other employees in the area other than the one
12  that was at the pharmacy?
13      A.   In that immediate area?
14      Q.   Yes.
15      A.   No.
16      Q.   Okay.  As you were leaving the store, did
17  you walk past any employees?
18      A.   I mean, I'm sure there were people at the
19  cash registers.
20      Q.   Okay.  And you didn't tell them about what
21  had just occurred?
22      A.   No.
23      Q.   Tell me about the low back pain that you've
24  had or the left leg pain that you've had, I guess,
25  since about 1985 or some years prior to this Kroger

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

March 10, 2016

1   incident?  Do you know what I'm talking about?

2        A.   My lower back pain?

3        Q.   Yes, ma'am.

4        A.   Yeah, that was from when I fell from the

5   Heritage Ford incident.

6        Q.   Okay.  And has it been an ongoing problem

7   for you, the low back pain?

8        A.   No.

9        Q.   I think you may have mentioned this already,

10  so if I ask it again I apologize.  Have you ever went

11  to a medical professional or provider and complained

12  of having cervical or neck pain in 2010 or any time

13  prior to the Kroger incident --

14       A.   No.

15       Q.   -- that you can recall?

16       A.   Not that I can recall, no.

17       Q.   Okay.  What about right shoulder pain at any

18  point prior to the Kroger incident?

19       A.   Not that I recall.

20       Q.   And the incident at your home where you fell

21  off of the step stool -- I think you said that was a

22  couple years ago?  Maybe, like, six years?

23       A.   It was quite a few years ago.

24       Q.   Okay.  Do you recall having a fall in your

25  home, or anyone else's home, in, I think, December of

Donna Rowell v. The Kroger Co.; et al.
Donna Rowell

Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 96 of 124

March 10, 2016

Page 96

1   2012?

2       A.    December 2012.  No.

3             MS. JONES:  Okay.  I just want to, if we

4       can, take a break.  I'm going to look at some

5       notes, but I may be close to wrapping up.  Okay?

6             THE WITNESS:  Okay.

7             (A recess was taken in the deposition at

8       1:11 p.m., and the deposition was resumed at 1:12

9       p.m.)

10      Q.    (By Ms. Jones)  Okay.  I want to make sure

11  we have your Social.  So what I'll do is we'll go off

12  the record for the last four.  But if you can just

13  tell me what your Social is so that I can confirm we

14  have it correctly.

15      A.    009-50-XXXX.

16      Q.    Okay.  And I want to make sure that we have

17  listed all of the places that you have treated or

18  currently -- currently treating for your injuries

19  related to the Kroger incident, okay?  So I'm going to

20  list off what has been provided to me by your attorney

21  and I want to make sure I have all the correct

22  providers, okay?

23      A.    Uh-huh.

24      Q.    Athens Orthopedic Urgent Care.  Do you

25  recall treating --

Donna Rowell v. The Kroger Co., et al.
Donna Rowell
Case 1:15-cv-00856-RWS   Document 41   Filed 06/24/16   Page 97 of 124
March 10, 2016
Page 97

```
 1      A.   Athens Orthopedic -- yes.  Yes.
 2      Q.   Okay.  What about Athens Orthopedic Clinic?
 3      A.   Yes.
 4      Q.   Athens Occupational Medical?
 5      A.   I don't know what that is.
 6      Q.   Okay.  What about Athens Regional Medical
 7 Center?
 8      A.   Yes.
 9      Q.   St. Mary's Hospital?
10      A.   Yes.
11      Q.   Spine Care & Pain Management?  And that's
12 off of Prince Avenue.
13      A.   Yes.
14      Q.   Is that where you currently go for
15 treatment?
16      A.   Yes.
17      Q.   Okay.  You mentioned having spoken with
18 someone at our, you know, main office or corporate
19 office.  Is that when you were referring to after you
20 made your claim with Kroger?
21      A.   Yes.
22      Q.   Before you retained an attorney?
23      A.   Yes.
24      Q.   Okay.  What conversations did you have with
25 anyone at Kroger or any of our main offices or agents
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                               March 10, 2016

Page 98

 1   that you had?  What kind of conversations did you have
 2   with them?
 3        A.   It was so long ago, but I remember -- I'm
 4   trying -- I'm sorry.
 5        Q.   That's okay.
 6        A.   I know that somebody called me a few days
 7   after the event happened.  And then again, like, maybe
 8   a week or two after I had received a paper from Kroger
 9   saying that they acknowledge the incident.  And by
10   that time I had gotten my -- I had spoken with James
11   and --
12        Q.   You don't have to tell me what you talked
13   about.
14        A.   No.
15        Q.   Okay.
16        A.   And at that point I just told the person at
17   Kroger that I had nothing to discuss with them, that I
18   had retained a lawyer.
19        Q.   Okay.  When someone called a few days after
20   the event, did they ask you what happened?  Do you
21   recall what they -- what the nature of the
22   conversation was at all?
23        A.   I mean, I never discussed what actually
24   happened with them.  They just, you know, told me
25   that -- or asked me, you know, what injuries I

Page 99

1   sustained, I believe.  You know, if anything had

2   happened, you know, to my body.  I mean, you know, to

3   my person.  But I don't remember them asking the

4   actual incident.

5       **Q.   Okay.**

6       A.   Yeah.

7       **Q.   You mentioned --**

8       A.   If I had gone and gotten treatment for

9   anything.

10      **Q.   So they wanted to know pretty much what your**

11  **injuries were and if you had been treated?**

12      A.   Right.

13      **Q.   And that was a few days after the incident?**

14      A.   Right.

15      **Q.   Okay.  Then you mentioned, I think, then the**

16  **next week or so someone else called?  Or was it the**

17  **same person?**

18      A.   It was the same person.

19      **Q.   And what was the nature of that**

20  **conversation?  Same type of conversation?**

21      A.   Yeah, yeah.  Well, I didn't really let her

22  get anywhere with the conversation because I told her

23  at that point that I had retained a lawyer and I could

24  no longer speak to her.

25      **Q.   Okay.  And you said something about a letter**

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

 1   that you received.  What did the letter say?

 2        A.   Just that if I needed anything, to contact.

 3   And it showed the contact information.

 4        Q.   Okay.  Did it say anything at all about the

 5   incident or what had happened?

 6        A.   To be honest, I don't remember.

 7        Q.   Do you still have the letter?

 8        A.   I don't -- anything that I had, I passed on

 9   to my lawyer, which has been given to you.

10        Q.   Or we would --

11        A.   As far as I know.

12        Q.   -- have to get it.  And I'll look to see if

13   it's something that has been produced, but I don't

14   think we've gotten that.  But I'll double-check.

15             But other than that one letter that you

16   received from Kroger, have you personally received

17   anything else from Kroger or anyone saying they work

18   on behalf of Kroger?

19        A.   No.  Huh-uh.

20        Q.   When did you retain a lawyer in this case?

21        A.   I don't remember exactly when it was.

22        Q.   Okay.  And was Mr. Loren the lawyer that you

23   retained?

24        A.   Yes.

25        Q.   How did you find Mr. Loren?

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                           March 10, 2016

Page 101

```
 1      A.    Just Internet search.
 2      Q.    Has anyone in your family ever worked with
 3 him before?
 4      A.    No.
 5      Q.    Have you worked with him before?
 6      A.    No.
 7      Q.    Have you ever had to hire an attorney
 8 before?
 9      A.    No.
10      MS. JONES:  Okay.  I think that's all I have
11   for you today, Ms. Rowell.  Thank you so much.
12      THE WITNESS:  Is it possible for me to look
13   at the incident report?
14      MS. JONES:  Oh, sure.  We'll stay on the
15   record.
16      THE WITNESS:  Yeah, I just wanted to see if
17   by looking at it that I could remember anything
18   about it.
19      Q.    (By Ms. Jones) Let me see.  I want to give
20 you a clean copy.  And just don't write on it now.
21      A.    No, I just want to see it because --
22      Q.    You can look at it.
23      A.    -- I don't remember -- I don't remember
24 doing any of this.  They're saying I filled this out?
25      Q.    No, no, no.  Portions of that are filled out
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

1   by the manager.  But I was asking you do you recall

2   giving them your driver's license or other

3   information.

4        A.   Is this Kelley -- can I speak of what's on

5   here?

6        Q.   Yeah.

7        A.   Oh, okay.  Is this Kelley Minish -- is that

8   a man or a woman or do you know?

9        Q.   It's a man.

10       A.   Oh, it is.  Okay.  The time of the incident

11   is totally incorrect.

12       Q.   Okay.  And what time do you recall the

13   incident occurring?

14       A.   The incident was at eleven o'clock in the

15   morning.

16       Q.   Okay.  And how do you know that?

17       A.   Because I would have never been at the store

18   at that time of day.

19       Q.   And why not?

20       A.   Because I pick up my daughter at 3:20 and

21   I'm in the parking lot at the school at 3:10, 3:15 at

22   the latest.

23       Q.   Do you know what day March -- I mean --

24   excuse me -- April 30th, what day of the week that is?

25       A.   No, but I remember it pretty much being a

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                        March 10, 2016

```
 1   school day.
 2        Q.   Okay.  And how do you remember that?
 3        A.   Because my ex was at work when I called him
 4   and he doesn't work on the weekend.
 5        Q.   Okay.
 6        A.   "Wearing flip-flops.  Customer stated she
 7   slipped in a puddle behind the wet floor cone."
 8   That's not what I said.
 9        Q.   Okay.  Tell me what you said.
10        A.   I told him that I walked around the cones.
11   Like I said, I saw the wet -- I saw the cones and I
12   looked for the water to see -- I mean, directly in
13   front of me, to see if there was any water on the
14   floor or around that area where the cones were.  And
15   then I walked to the right and walked down the aisle
16   quite a ways.  I mean, at least 30, 40 feet before I
17   stopped and went in between the tables and reached for
18   the freezer door and fell.
19             So I don't -- I don't know -- I mean, like I
20   said, when -- when they took my statement they had a
21   piece of paper, like, you know, a notebook paper.
22        Q.   Okay.
23        A.   And they just took down the information and
24   were very unprofessional about it.
25        Q.   Tell me why they were unprofessional.
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 104

 1      A.   I mean, they just seemed like they really
 2  didn't care about taking my statement or any concern
 3  about me falling or anything like that.  Or even
 4  seeing where I fell or, you know, asking me if I was
 5  okay or -- you know, like any decent customer service
 6  manager should have been.
 7      Q.   Okay.  So had you -- let me ask you this.
 8  Had you encountered those managers prior to this April
 9  30th incident?
10      A.   Yes.
11      Q.   Were they --
12      A.   Plenty of times.  I've -- I mean, I go there
13  all the time.  And actually, I had clients -- when I
14  worked for Advantage Behavioral Health System, I
15  placed clients in that Kroger store.  I worked with my
16  clients in that store.  I knew several of the managers
17  and some employees that worked there.  So I had
18  interacted with some of these people prior to this
19  event.  And so, I mean...
20      Q.   Okay.  Tell me who you know -- based on your
21  involvement or engagement with Kroger, tell me the
22  names of the people that you know from that store.
23      A.   I mean, a lot of the people I know by first
24  names, not --
25      Q.   Okay.



Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 105

```
 1       A.    -- their last names.
 2       Q.    No problem.
 3       A.    But, I mean, I know Barbara, a little, short
 4  lady.
 5       Q.    Black or white?
 6       A.    Black.
 7       Q.    Uh-huh.
 8       A.    I know -- I mean, I know a lot of the --
 9  well, people have left, though.  I mean, this is
10  talking about 15, 20 years.
11       Q.    Okay.
12       A.    Over the last 15, 20 years.  But there's,
13  like, Les.  He's, like, a bagger.  He's, like,
14  disabled.
15       Q.    Les?
16       A.    Les, yeah.
17       Q.    Okay.  L-E-S-S?
18       A.    Yeah.  No, one S.
19       Q.    L-E-S, okay.
20       A.    Yeah.  And Michael and I know Melissa and I
21  know -- shoot, what is his name.  Scott.  And he's
22  real short.  Let's see who else I know.  Oh, what's
23  that blonde lady's name?  She always keeps her hair
24  back.  I can't think.  And then there was Doug in the
25  deli and there's -- I know several.  I mean, I know a
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 106

1   lot of people by face.

2       Q.   Okay.  Right.

3       A.   I mean, different people by...

4       Q.   I'm the same way.

5       A.   I mean, they know me by face 'cause I've

6   been going there for the last 20 years now.

7       Q.   Okay.

8       A.   So...

9       Q.   Let me ask you this.  You mentioned that the

10  manager may have seemed like he was unconcerned.

11  Prior to this April 30th incident, had you ever had a

12  problem where you didn't receive good customer service

13  at that store?

14      A.   Not really.

15      Q.   Okay.  And since the incident, have you ever

16  had a time where you hadn't received good customer

17  service at that store?

18      A.   I caught -- I caught Barbara following me

19  around.

20      Q.   When was this?

21      A.   About three or four months ago.  And she was

22  really obvious about it.  It was funny.

23      Q.   What did she say?

24      A.   She -- I mean, I didn't say anything to her.

25  But, I mean, she was obvious about it because I

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 107

1   stopped, 'cause I felt her following me, and I -- I

2   turned to look and she, like, ducked back behind the

3   aisle.  It was so obvious.

4        Q.    Did she say why she was following you?

5        A.    No, but it was just funny.

6        Q.    Okay.

7        A.    I mean, it was just hilarious.

8        Q.    You mentioned that --

9        A.    See, how could she even say anything?  She

10  wasn't there.

11       Q.    Who is "she"?  Who are you referring to?

12       A.    Barbara.  She -- I mean, she's sitting here

13  describing the incident, but she wasn't there.

14       Q.    Well, let me see it.  Can I see this?

15       A.    "Small amount of water."  There was 5

16  feet -- I mean, it was at least half of this table.

17       Q.    Let me see.

18       A.    It was so crazy.

19       Q.    Well, I don't know if this --

20       A.    And actually --

21       Q.    -- is Barbara's writing.

22       A.    -- signed this.

23       Q.    I don't know if this is Barbara's writing

24  over --

25       A.    And this is funny because this one doesn't

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 108

 1  have the -- the time and the date stamped on it.

 **2      Q.   Well --**

 3      A.   But you would think that this would if it

 4  was copied.

 **5      Q.   Just for the record, that is what I received**

 **6  from the store, myself.**

 7      A.   Uh-huh.

 **8      Q.   The time and date -- it was a facsimile that**

 **9  was sent from the store to its third-party**

**10  administrator, who it has to submit the claims to.  So**

**11  for the record, it's not a discrepancy with regards to**

**12  submission of date.**

13      A.   But it -- would it -- so the time on it is

14  not necessarily the truth then.

**15      Q.   I'm not sure what you're asking me,**

**16  Ms. Rowell.**

17      A.   Because -- okay.

18           MR. LOREN:  The question -- you can answer

19      the question.

20           THE WITNESS:  Huh?

21           MR. LOREN:  If there's a question, you can

22      answer the question.

23           THE WITNESS:  Okay.  I'm sorry.  But no, the

24      time is inaccurate.

**25      Q.   (By Ms. Jones)  Okay.  So you're saying that**

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

1   you couldn't have been in the store at or around 3:30?

2       A.   It says 3:30, correct.

3       Q.   Okay.

4       A.   Because I had already gone to the doctor

5   before I went and picked up my daughter.

6       Q.   Okay.

7       A.   Yeah.

8       Q.   And that's -- a deposition is not for you to

9   prove your case.

10      A.   Okay.  I apologize.

11      Q.   It's so -- it's just a fact gathering for

12  me.  'Cause I wasn't there and your attorney wasn't

13  there.

14      A.   Right.  Okay.

15      Q.   So you and the other people that were there

16  provide the facts of what happened.

17      A.   Okay.

18      Q.   So that's all I'm asking for you.  It's not

19  to --

20      A.   Yeah.

21      Q.   -- trip you up or make you --

22      A.   No.

23      Q.   -- feel wrong in any way, okay?

24      A.   Right.  I just don't like anybody to lie on

25  me.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

 1      Q.   I mean, people's recollection of the events

 2   are different.

 3      A.   Yeah.

 4      Q.   And so that's why we're here today, because

 5   we want to know what you recall about the incident.

 6   And I'm sure your attorney will talk to Kroger

 7   employees about what they recall.

 8      A.   Uh-huh.

 9      Q.   So it's just a fact gathering.

10      A.   Okay.

11      Q.   So please don't take offense to anything

12   that you believe is incorrect, okay?

13      A.   Okay.

14      Q.   So you're saying you do disagree with the

15   description of, one, the amount of water seen on the

16   floor?

17      A.   Uh-huh.  Definitely.

18      Q.   Okay.  And if I'm not mistaken, you also

19   have a problem with the time that it occurred.

20      A.   Correct.

21      Q.   You're saying it was earlier in the day?

22      A.   Yes.

23      Q.   Okay.  Have you seen Mr. Minish at all or

24   anyone since the subject incident?  I think you --

25      A.   Yes.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                            March 10, 2016

Page 111

 1      Q.   -- testified earlier there have not been any
 2   kind of -- they haven't been rude to you or --
 3      A.   Correct.
 4      Q.   -- not pleasant.
 5      A.   Right.
 6      Q.   Okay.  But you said on the day of incident
 7   they acted like -- "they" meaning the managers --
 8   acted like they didn't care, or that something had
 9   happened?
10      A.   They acted like they were distracted, I
11   guess.  And now that I think about it, maybe because
12   of the fact that the water was leaking.  Maybe they
13   were distracted.
14      Q.   Okay.
15      A.   I mean, I guess I could look at it that way.
16      Q.   You also mentioned that they were writing on
17   a piece of paper as opposed -- I guess what you're
18   saying, as opposed to the incident report.
19      A.   It's -- yes, correct.
20      Q.   Okay.  But they were taking down the
21   appropriate information.  You would agree with that,
22   right?
23      A.   Yes.
24      Q.   As far as your name and what had happened?
25      A.   Yes.

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

```
 1        Q.    Okay.

 2        A.    I just -- I had asked them if there was

 3   something I needed to sign or anything like that, or

 4   if I needed to get a copy of anything.  And they just

 5   said, no.

 6        Q.    Okay.  Since then, there hasn't been any

 7   problems with anyone at the store?

 8        A.    No.

 9        Q.    Okay.

10        A.    No.

11        Q.    You still go there?

12        A.    Yes.

13        Q.    It's still your neighborhood Kroger?

14        A.    Yeah.

15        Q.    I actually got my Starbucks there this

16   morning.

17              Would you have any reason to disagree with

18   them saying that you were wearing flip-flops?  Do you

19   recall wearing flip-flops?

20        A.    I wear flip-flops.  It's a possibility that

21   I was.

22              MS. JONES:  Okay.  I think that's all the

23        questions I have.

24              THE WITNESS:  Okay.

25              MS. JONES:  Okay.
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 113

1          MR. LOREN:  Ms. Rowell, I have a couple of

2     follow-up questions.

3          THE WITNESS:  Okay.

4                    DIRECT EXAMINATION

5  BY MR. LOREN:

6     Q.    All right.  You were asked earlier, just in

7  terms of what the floor was like, was it tile or what

8  material the floor was.  Do you have a recollection of

9  what material it was made out of, the floor?

10    A.    I mean, I don't -- I know it was squares.  I

11 assume it was tile.  I mean, it's, like, white

12 squares.  So I assumed it was tile, unless it's

13 concrete that's cut in squares.

14    Q.    Okay.  That's fine.

15    A.    I don't know the difference in materials.

16    Q.    That's fine.

17    A.    To be honest.

18    Q.    When you mentioned that there was a large

19 puddle of water -- I think you described it as 5 feet

20 wide, 3 feet long, or whatever it is -- 5-by-3, more

21 or less.

22    A.    Yeah.

23    Q.    Do you know whether that water was coming

24 out from underneath the bank of freezers?

25         MS. JONES:  Objection.  Leading.  You can

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

March 10, 2016

```
 1      answer the question.

 2      Q.   (By Mr. Loren)  Do you know where the water

 3  was coming from?

 4      A.   I don't know.  I would assume that it -- can

 5  I say that?

 6      Q.   You can --

 7      A.   I would assume that it was coming from the

 8  freezer.  I saw a crack that -- I mean, when I went

 9  back the next day or so, that I just -- that's where I

10  thought it may have been coming from.

11      Q.   Okay.  Well, let me ask -- when you had

12  fallen, you mentioned your pants were wet.

13      A.   Yes.

14      Q.   Did you get a chance to look at the water on

15  the floor at that point in time?

16      A.   Yes.

17      Q.   All right.  Do you know if that water on the

18  floor was protruding and going underneath the freezer?

19           MS. JONES:  Objection to form.  Leading.

20      Q.   (By Mr. Loren)  You can answer the question.

21  Please help me out here.  You can answer the question.

22      A.   I could not tell if it was going under the

23  freezer.

24      Q.   Okay.  Was the water warm or cold when you

25  felt it?
```


Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

March 10, 2016

Page 115

1     A.    It felt warm.

2     Q.    Was the store busy on that day?

3     A.    No.

4     Q.    How long after your fall were you diagnosed

5  with that clavicle fracture, to the best of your

6  recollection?

7     A.    Maybe a month and a half.

8     Q.    Were you having problems that were

9  continuing with that clavicle area that ultimately led

10  to the diagnosis?

11         MS. JONES:  Objection.  Leading.

12     A.    I was having continual pain going from my

13  neck all the way down my right arm.  I mean, it was

14  continually bothering me, the whole right side of

15  my -- from my neck to my -- to my elbow.  So they were

16  continually taking x-rays.  Every time I was going to

17  Athens Orthopedic, they x-rayed that -- that side of

18  my body.

19     Q.    (By Mr. Loren)  Did you have any falls or

20  any sort of traumatic incidents between April 30th,

21  2014, and the date they diagnosed you with a clavicle

22  fracture?

23     A.    No.

24     Q.    Do you know if --

25         MS. JONES:  Can I see a copy of what you're

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

```
 1      showing your witness?

 2           MR. LOREN:  I'm not showing her anything

 3      yet.

 4           MS. JONES:  Okay.  Well, you're leading --

 5      you're leaning towards her with documents in your

 6      hand that you're probably going to reference.  So

 7      if you're going to reference something, I would

 8      like for you to show me.

 9           MR. LOREN:  Well, I would appreciate it if

10      you don't make assumptions and -- 'cause I haven't

11      showed her anything.

12           MS. JONES:  Okay.

13           MR. LOREN:  Thank you.

14      Q.   (By Mr. Loren)  Ms. Rowell, let me ask you

15 this.  Do you know if the store has changed form from

16 April 30th, 2014, to the present in that area where

17 you fell?  Do you know if it got changed or modified

18 in any way?

19      A.   Oh, yes.  Yes.  They -- within a week of my

20 fall, they took out all the tables that were in the

21 middle of that aisle.  They took them out of that

22 aisle.  And they had those rolls up all down through

23 the aisle against the freezers to -- to hold the

24 water.

25      Q.   Do you have a recollection as to whether or
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                          March 10, 2016

```
 1    not the aisle -- setting aside what you just
 2    mentioned, that there were rolls alongside the
 3    freezer --
 4        A.   Uh-huh.
 5        Q.   -- do you know if the actual construction
 6    has changed in any way in that location where you fell
 7    since April 30th, 2014, to the best of your
 8    recollection?
 9        A.   The construction.  In that specific area?
10    From that date to today?
11        Q.   From April 30th, 2014, to the present, do
12    you know if that area -- whether the freezers changed,
13    or anything that was like a fixture -- let's say a
14    stand that was built in or, for instance --
15             MS. JONES:  Objection to the extent that
16        you're leading.
17        Q.   (By Mr. Loren)  Okay.  Has anything changed?
18    If you know.
19        A.   I don't know.  I mean, immediately after the
20    fall -- I mean, I went back and they had changed it
21    where they had taken out the -- the cones and moved
22    them over in front of -- of things.
23        Q.   No, that part I got.  But I'm asking you in
24    terms of the infrastructure or --
25        A.   Oh.
```

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 118

```
 1      Q.   -- the freezers, walls -- anything.  Has

 2  anything changed from the date of the fall to the

 3  present, if you remember?

 4      A.   No.  I can't remember.

 5           MR. LOREN:  Okay.  I have no further

 6      questions.

 7           MS. JONES:  Okay, Ms. Rowell.  Are you going

 8      to read and sign or are you waiving signature or

 9      what are you doing?

10           MR. LOREN:  We're going to read and sign.

11           MS. JONES:  All right.

12           (The deposition was concluded at 1:37 p.m.

13      Pursuant to Rule 30(e) of the Federal Rules of

14      Civil Procedure and/or O.C.G.A. 9-11-30(e),

15      signature of the witness has been reserved.)

16

17

18

19

20

21

22

23

24

25
```

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 119

 1  STATE OF GEORGIA

 2  COUNTY OF GWINNETT:

 3

 4          I hereby certify that the foregoing

 5  transcript was reported, as stated in the caption, and

 6  the questions and the answers thereto were reduced to

 7  typewriting under my direction; that the foregoing

 8  pages represent a true, complete, and correct

 9  transcript of the evidence given upon said hearing,

10  and I further certify that I am not of kin or counsel

11  to the parties in the case; am not in the employ of

12  counsel for any of said parties; nor am I in any way

13  interested in the result of said case.

14          This the 29th of March, 2016.

15

16

17

18

19

20

21

22          Alison M. Wyman, CCR-2529, RPR

23

24

25

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

Page 120

1                    DISCLOSURE OF NO CONTRACT

2          I, Alison M. Wyman, Certified Court
   Reporter, do hereby disclose pursuant to Article 10.B.
3  of the Rules and Regulations of the Board of Court
   Reporting of the Judicial Council of Georgia that I am
4  a Georgia Certified Court Reporter; I was contacted by
   the party taking the deposition to provide court
5  reporting services for this deposition; I will not be
   taking this deposition under any contract that is
6  prohibited by O.C.G.A. 15-14-37(a) and (b) or Article
   7.C. of the Rules and Regulations of the Board; and I
7  am not disqualified for a relationship of interest
   under O.C.G.A. 9-11-28(c).
8          There is no contract to provide reporting
   services between myself or any person with whom I have
9  a principal and agency relationship nor any attorney
   at law in this action, party to this action, or party
10 having a financial interest in this action.  Any and
   all financial arrangements beyond my usual and
11 customary rates have been disclosed and offered to all
   parties.

12

13

14

15

16

17

18 _____

19 Alison M. Wyman

20 Certified Court Reporter

21 Certificate No. 2529

22

23

24

25

Elizabeth Gallo
COURT REPORTING, LLC

www.GeorgiaReporting.com/Schedule
404.389.1155

Page 121

1      CASE:  Donna Rowell v. The Kroger Co., et al.

2      NAME OF WITNESS:     Donna Rowell

3                  The preceding deposition was taken

4      in the matter, on the date and at the time and

5      place set out on the title page hereof.

6

7                  It was requested that the deposition

8      be taken by the reporter and that same be

9      reduced to typewritten form.

10

11                 It was agreed by and between counsel

12     and the parties that the deponent will read and

13     sign the transcript of said deposition.

14

15                 Said jurat is to be returned within

16     30 days following receipt of the transcript to

17     the following address:

18

19                 Elizabeth Gallo Court Reporting, LLC

20                 2900 Chamblee Tucker Road

21                 Building 13, First Floor

22                 Atlanta, Georgia 30341

23

24

25

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                             March 10, 2016

Page 122

1  NAME OF CASE:        Donna Rowell v. The Kroger Co., et al.

   DATE OF DEPOSITION: 03/10/2016

2  NAME OF WITNESS:    Donna Rowell

3  EGCR Job No.:        30281

4                  CERTIFICATE

5        Before me this day personally

   appeared DONNA ROWELL, who, being duly

6  sworn, states that the foregoing transcript of

   his/her deposition, taken in the matter, on

7  the date and at the time and place set out on

   the title page hereof, constitutes a true and

8  accurate transcript of said deposition.

9                  _____

10                     DONNA ROWELL

11        SUBSCRIBED and SWORN to before me

12  this _____ day of _____ 20____.

13  in the jurisdiction aforesaid.

14

    _____      _____

15  My Commission Expires      Notary Public

16      STATE OF _____

17      COUNTY/CITY OF _____

18

19      []   No changes made to the Errata Sheet;

20  therefore, I am returning only this signed,

21  notarized certificate.

22      []   I am returning this signed,

23  notarized certificate and Errata Sheet with

24  changes noted.

25

Donna Rowell v. The Kroger Co., et al.
Donna Rowell                                                    March 10, 2016

1                      Errata Sheet

2     NAME OF CASE:        Donna Rowell v. The Kroger Co., et al.

3     DATE OF DEPOSITION: 03/10/2016

4     NAME OF WITNESS:     Donna Rowell

5     Reason Codes:  1. To clarify the record

6                    2. To correct transcription errors

7                    3. Other

      _____

8     _____

9     Page _____ Line _____ Reason _____

10    From _____ to _____

11    Page _____ Line _____ Reason _____

12    From _____ to _____

13    Page _____ Line _____ Reason _____

14    From _____ to _____

15    Page _____ Line _____ Reason _____

16    From _____ to _____

17    Page _____ Line _____ Reason _____

18    From _____ to _____

19    Page _____ Line _____ Reason _____

20    From _____ to _____

21    Page _____ Line _____ Reason _____

22    From _____ to _____

23

      SIGNATURE:_____DATE:_____

24            Donna Rowell

25

Donna Rowell v. The Kroger Co., et al.
Donna Rowell

March 10, 2016

Page 124

```
1                    Errata Sheet

2     NAME OF CASE:       Donna Rowell v. The Kroger Co., et al.

3     DATE OF DEPOSITION: 03/10/2016

4     NAME OF WITNESS:    Donna Rowell

5     Reason Codes:  1. To clarify the record

6                    2. To correct transcription errors

7                    3. Other

      _____

8     _____

9     Page _____ Line _____ Reason _____

10    From _____ to _____

11    Page _____ Line _____ Reason _____

12    From _____ to _____

13    Page _____ Line _____ Reason _____

14    From _____ to _____

15    Page _____ Line _____ Reason _____

16    From _____ to _____

17    Page _____ Line _____ Reason _____

18    From _____ to _____

19    Page _____ Line _____ Reason _____

20    From _____ to _____

21    Page _____ Line _____ Reason _____

22    From _____ to _____

23
        SIGNATURE:_____DATE:_____

24              Donna Rowell

25
```